UNITED STATES of America, Plaintiff,

v.

Mauro A. BARRIOS, Ramiro Rojas–Cabral, Ronald Eenhuis, Santos Rojas, Efrain Gallegos, Alfredo Paiz, Arturo Rojas–Cabral, Cristobal Rojas, Genaro Rivera, Jose Angel Gutierrez, David Arciniega–Barcenas, Juan Rodriguez–Guarado, Nelson Cordova, and Meli (LNU) last name unknown, Defendants.

Crim. No. 97–CR–173–B.

United States District Court, D. Colorado.

Feb. 18, 1998.

Al LaCabe, Gregory Rhodes, Asst. U.S. Attys., Denver, CO, for Plaintiff.

Benjamin Jaramillo, Denver, CO, Stanley Marks, Richard Hostetler, Denver, CO, Harvey Steinberg, Denver, CO, Duane Montano, Denver, CO, Richard Kornfeld, Denver, CO, E. Richard Toray, Denver, CO, Kenneth Padilla, Denver, CO, Felix Garcia, Denver, CO, Ralph B. Rhodes, Denver, CO, Frank Moya, Denver, CO, Warren R. Williamson, Asst. Federal Public Defender, Denver, CO, Wade Eldridge, Denver, CO, Jeffrey Edelman, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Pending are motions to suppress evidence obtained as a result of four separate wiretaps and extensions of two of the four wiretaps utilized by the government during its investigation of this case. A twenty-five (25) count indictment was returned against the fourteen (14) defendants charging all defendants with conspiracy in violation of 21 U.S.C. § 846; 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii) and 18 U.S.C. § 2. In the remaining twenty-four (24) counts, various defendants are charged with various counts in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii) and (viii), 21 U.S.C. § 843(b), and 18 U.S.C. § 2. Based on the motions, briefs, evidence, and argument of counsel, and pursuant to the following findings of fact and conclusions of law, I will deny the motions.

### I.

#### *Background*

In November, 1995, a confidential source (CS–1) informed Detective Tabares, Denver Police Department, that Ramiro Rojas–Cabral (R. Rojas–Cabral), Mauro Barrios (Barrios), Genaro Rivera (Rivera) and Rogelio [Last Name Unknown] (LNU) were importing ten to fifteen kilograms of cocaine and methamphetamine and multiple kilograms of marijuana for sale in the Denver metropolitan area. 95–WT–3–S (WT–3) Aff. p. 13. CS–1 told Det. Tabares that Rivera traveled to El Monte, Santa Anna and Compton, California to meet with his drug supplier to purchase these drugs. Rivera would then hire couriers to transport the drugs to Denver by automobile. *Id.* CS–1 stated that R. Rojas–Cabral and Rivera managed the drug distribution organization by making arrangements for the drugs to be received from the couriers and taken to a "stash house" where the drugs were hidden and stored.

During the ensuing investigation, four wiretap interceptions were authorized by United States District Judge Daniel B. Sparr. The first wiretap, 97–WT–3–S (WT–3), was authorized on February 4, 1997 to intercept communications on two digital display paging devices: 1) telephone number (303) 760–8366 subscribed to by Rigoberto Ramirez and used primarily by R. Rojas–Cabral; and 2) telephone number (303) 851–0894, subscribed to by Dana Victor Pena and used primarily by Barrios. The wiretap on pager number (303) 851–0894 was extended for an additional thirty days on March 5, 1997. No extension was sought on pager number (303) 760–8366 because service was discontinued. The government's affidavit stated that R. Rojas–Cabral threw away the pager to increase security for his alleged drug enterprise.

The second wiretap, 97–WT–4–S (WT–4), was authorized on March 11, 1997 to intercept communications on a digital display paging device with telephone number (303) 505–0387 used primarily by R. Rojas–Cabral. The government's affidavit states this was the replacement device for pager number (303) 851–0894. This wiretap was extended for an additional thirty days on April 9, 1997.

The third wiretap, 97–WT–5–S (WT–5), was authorized on March 24, 1997 to intercept communications on two cellular telephone numbers (303) 548–4330 and (303) 916–9405. The government's affidavit recit-

ed that cellular number (303) 548–4330 was believed to be used primarily by R. Rojas–Cabral. Cellular number (303) 916–9405 was believed to be used primarily by Barrios. Based on information gained from pen registers and other sources, the government believed the following were potential interceptees on these wiretaps: R. Rojas–Cabral, Barrios, Rivera, Jose Juan Guzman, Rogelio Munoz–Nunez, Aaron Munoz–Nunez, Rogelio (LNU), Cristobal Rojas–Cabral, Arciniega, Juan Carlos Chavez, Gutierrez, and Eenhuis. On April 23, 1997, the wiretap was extended for thirty days on (303) 916–9405 only. No extension was sought on telephone number (303) 548–4330 because it was believed that R. Rojas–Cabral had discarded this cellular telephone in an effort to avoid law enforcement investigation.

The fourth wiretap · order, 97–WT–7–S (WT–7), signed on April 16, 1997, authorized the interception of communications on telephone number (303) 921–2191, the replacement telephone acquired by R. Rojas–Cabral after discontinuation of (303) 548–4330. The following persons were listed as possible interceptees: Barrios, Rivera, Jose Juan Guzman, Rogelio Munoz–Nunez, Aaron Munoz–Nunez, Rogelio (LNU), Cristobal Rojas–Cabral, Arciniega–Barcenas, Juan Carlos Chavez, Gutierrez, and Eenhuis, Jose Santos Rojas, Arturo Rojas–Cabral, Jose A. Hernandez, Abel Delacruz, Roberto (LNU), Amilcar Ramirez Sosa, and Rudolpho Miranda–Cabrera.

Each application and extension following WT–3 incorporated the preceding affidavits. Throughout the wiretapping process, the list of potential interceptees changed and expanded based on new information gained from the first wiretaps as well as other sources. However, the primary users for each pager and telephone, R. Rojas–Cabral and Mauro Barrios, remained the same.

## II. ·

In an order dated October 28, 1997, I denied defendants' motions for a *Franks* hearing, motions to suppress WT–5 and WT–7 for failure to minimize conversations pursuant to 18 U.S.C. § 2518(5), and defendant A. Rojas–Cabral's motion to suppress wiretaps for failure to give notice pursuant to 18 U.S.C. § 2518(8)(d). All defendants except

Juan Rodriguez Guarado move to suppress wiretaps for failure to satisfy the necessity requirement of 18 U.S.C. § 2518(1)(c) in the wiretap applications and affidavits. Having entered an unconditional guilty plea to one count of violation of 21 U.S.C. § 843(b), defendant Alfredo Paiz' motion is now moot. Defendants Eenhuis, Gutierrez, Santos Rojas, and A. Rojas–Cabral move to suppress wiretaps for lack of probable cause in violation of § 2518(1)(b)(i) and (3)(b).

## III.

The federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510 *et seq.*, established a three-tiered procedure for obtaining authorization to intercept wire or oral communications. Strict adherence to these procedural steps is required to obtain a wiretap order. *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). First, a duly authorized law enforcement officer must obtain approval from the United States Attorney General or a designated Assistant Attorney General to apply to a federal judge for a wiretap. 18 U.S.C. § 2516(1). Second, after such approval is obtained, the officer must present to the judge a written application for a wiretap. 18 U.S.C. § 2516(1), (3). Third, the judge must make certain enumerated findings and issue an *ex parte* order addressing specific elements. 18 U.S.C. §§ 2516(1), (3), 2518(1), (3), (4). Only the third step is at issue.

A wiretap authorization order is presumed proper and the defendants bear the burden of overcoming this presumption. *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir.1997). The defendants must make a *prima facie* showing that the wiretap was conducted pursuant to an illegal order. *United States v. Picone*, 560 F.2d 998, 1001 n. 4 (10th Cir.1977). Suppression under 18 U.S.C. § 2518(10)(a) is required for "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use · of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527,

94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Title III's separate and distinct probable cause requirement is encompassed within this standard. *See United States v. Donovan,* 429 U.S. 413, 433–35, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *United States v. Castillo–Garcia,* 117 F.3d 1179, 1185 (10th Cir.), *cert. denied sub nom. Armendariz–Amaya v. United States,* —— U.S. ——, 118 S.Ct. 395, 139 L.Ed.2d 309 (1997). Although the Title III requirements should be observed strictly, not "every failure to comply fully with any requirement provided in Title III render[s] the interception of wire or oral communications 'unlawful.'" *United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); *See Donovan,* 429 U.S. at 434 (failure to comply fully with § 2518(1)(b)(iv) identification requirement and § 2518(8)(d) notice requirement does not render unlawful an intercept order that in all other respects satisfies Title III requirements). The government's showing of necessity is tested in a practical and common sense fashion under the totality of the circumstances. *Castillo–Garcia,* 117 F.3d at 1187.

## A. *Necessity*

Section 2518(1) provides in pertinent part:

Each application shall include the following information:

. . . . .

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed ... (iv) the identity of the person, if known committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous....

In *Castillo–Garcia,* the Tenth Circuit stated that "[t]o obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried *against the target of the wiretap." Id.* at 1187 (emphasis added). "The statements must be factual in nature and *they must specifically relate to the individuals targeted by the wiretap." Id.* at 1188 (emphasis added). These pronouncements beg the obvious question pivotal to the necessity issue here. Who or what is a "target" of a wiretap?

As I understand it, defendants couple the above statutory provisions with this language from *Castillo–Garcia* to frame their necessity argument. That is, pursuant to § 2518(b)(iv), if the government has probable cause to believe an individual has, is, or is about to commit the offenses set forth in the application, the application must include the identity of that individual and a particularized necessity showing as to that individual pursuant to § 2518(c). Failure to name any such individual results in a material omission upon the necessity showing required as to that individual. Further, defendants define "target" as a user or interceptee for which there is probable cause whether or not included in the application. Here, because such defects infect the applications for wiretaps 97–WT–3 and 97–WT–4 and their extensions, the communications intercepted were unlawful for failing to meet the "necessity" requirement in 18 U.S.C. § 2518(1)(c). Because WT–5 and WT–7 incorporated the WT–3 and WT–4 authorization applications, defendants further contend evidence obtained as a result of WT–5 and WT–7 must be suppressed as fruits of illegal wiretaps WT–3 and WT–4. *See* 18 U.S.C. § 2518(10)(a).

Beginning with *Castillo–Garcia,* the government relies on a trilogy of Tenth Circuit cases for the proposition that there is no requirement the government make a particularized necessity showing as to each violator and/or interceptee of a wiretap named or who could be named in a wiretap application. Rather, according to the government, the necessity test is applied only to the "primary targets" of the investigation, which may include an alleged criminal enterprise or conspiracy, regardless whether probable cause exists as to other possible violators and interceptees.

In *Castillo–Garcia,* the Court examined several successive wiretaps employed in the investigation of a suspected drug conspiracy. In commenting on the adequacy of the applications and affidavits filed in support of the

wiretap applications, the Court condemned the use of generalities, or statements in the conclusory language of the statute to support a wiretap application. *Castillo–Garcia*, 117 F.3d at 1188.

Although *Castillo–Garcia* stated that information in the wiretap applications must "specifically relate to the individuals targeted by the wiretap," *id.*, it did not articulate how to determine who or what are targets. When *Castillo–Garcia* is dissected, it appears that the Tenth Circuit does not require a particularized necessity showing as to each interceptee, named or potential. This conclusion is buttressed by *United States v. Killings-worth*, 117 F.3d 1159 (10th Cir.1997), decided the same day as *Castillo–Garcia*, and *United States v. Bovie*, 120 F.3d 271, 1997 WL 423114 (10th Cir.1997), decided one month later. Collectively, this trilogy appears to limit a necessity showing to "primary targets" only. Moreover, these cases indicate that the conspiracy or illegal enterprise itself may be classified as a "primary target."

In *Castillo–Garcia*, the Court evaluated five wiretaps denominated WT–4, WT–7, WT–8, WT–10, and WT–11. As reflected in defendants' charts admitted here upon the motions, the users and persons to be intercepted were listed as follows:

| Wiretap Number | User(s) | Interceptee |
| --- | --- | --- |
| WT–4 | Rosario Portillo–Rodriguez | Rosario Portillo–Rodriguez<br>Jose Portillo–Rodriguez<br>Baudelio Partillo–Rodriguez<br>Apolonio Portillo–Rodriguez<br>James Scott Sedgley |
| WT–7 | Ceferino Castillo–Garcia<br>Ismael Armendariz–Amaya<br>Rosario Portillo–Rodriguez | Rosário Portillo–Rodriguez<br>Ceferino Castillo–Garcia<br>Ismael Armendariz– |
| WT–8– | | |
| 251–1594 (pager) | 1) Ceferino Castillo–Garcia<br>Ismael Armendariz–Amaya<br>Rosario Portillo–Rodriguez | Rosario Portillo–Rodriguez<br>Ceferino Castillo–Garcia<br>Ismael Armendariz–Amaya<br>Guerreros Sanchez–Olivas<br>Jaime Olivas–Sanchez |
| 609–1931 (pager) | 2) Guerreros Sanchez–Olivas<br>Jaime Olivas–Sanchez<br>Rosario Portillo–Rodriguez | |
| WT–10 | Ceferino Castillo–Garcia<br>Ismael Armendariz–Amaya<br>Fidelia Armendariz<br>Rosario Portillo–Rodriguez | Rosario Portillo–Rodriguez<br>Ceferino Castillo–Garcia<br>Ismael Armendariz–Amaya<br><br>Fidelia Armendariz<br>Jeffrey Samuel Pino |
| WT–11 | Jaime Olivas–Sanchez<br>Guerreros Sanchez–Olivas<br>Rosario Portillo–Rodriguez | Rosario Portillo–Rodriguez<br>Jaime Olivas–Sanchez<br>Guerreros Sanchez–Olivas |

The District Court judge denied a motion to suppress evidence obtained pursuant to WT–4. However, the District Court suppressed the wiretap evidence obtained by WT–7, WT–8, WT–10 and WT–11 because he found that the government had not demonstrated necessity as required by 18 U.S.C. § 2518(c).

On appeal, the *Castillo–Garcia* court examined the wiretaps to determine whether each of the five applications contained "a full and complete statement" demonstrating that every required investigative technique "ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §§ 2518(1)(c) and 2518(3)(c).

In making its determination of the legality of the five wiretaps the Court identified the following individual targets:

WT–4: Rosario Portillo–Rodriguez

WT–7: Ceferino Castillo–Garcia

WT–8: Ceferino Castillo–Garcia and Jaime Olivas–Sanchez

WT–10: Ceferino Castillo–Garcia

WT–11: Jaime Olivas–Sanchez and Rosario Portillo–Rodriguez

As to WT–4, the Court agreed with the District Court that the application demonstrated sufficient necessity. As to WT–7 (incorporating the WT–4 application), the Court discussed additional facts showing the necessity for wiretapping Ceferino Castillo–Garcia. The Court also mentioned investigative information pertaining to defendant Ismael Armendariz–Amaya, but rested its reversal of the District Court's grant of the defendants' motion to suppress evidence obtained from WT–7 on the adequacy of investigative techniques employed against Castillo–Garcia only.

In evaluating WT–8 (issued simultaneously with WT–7 and incorporating the WT–4 application), the Court relied on the additional facts in the application for WT–7 to find that the government had demonstrated sufficient necessity to wiretap Castillo–Garcia's communications and reversed the District Court's suppression order granted on his behalf. However, the Court found a showing of necessity lacking in WT–8 as to Jaime Olivas–Sanchez. Specifically, the Court noted that nothing in the application was "in any way particularized to Jaime Olivas–Sanchez." *Castillo–Garcia*, 117 F.3d at 1194. The Court then affirmed the District Court order suppressing evidence obtained against Olivas–Sanchez in WT–8.

In WT–10 (incorporating the WT–4 and WT–7 applications), the Court limited its inquiry to information pertaining to Castillo–Garcia. Again relying on applications for WT–4 and WT–7, incorporated by reference into WT–10, the Court reversed the order of the District Court suppressing evidence obtained from WT–10.

Likewise, in reviewing WT–11, the Court limited its examination of information in WT–4 and WT–8 applications to that which concerned Jaime Olivas–Sanchez. In affirming the District Court's order suppressing evidence obtained from WT–11, the Court noted that the application for WT–11 contained nothing adding anything to its earlier inadequate showing as to Olivas–Sanchez.

Summarizing its *de novo* review of the District Court's conclusions, the *Castillo–Garcia* court stated that:

> with respect to defendant-appellee Ceferino Castillo–Garcia, the government did attempt certain 'normal investigative procedures,' sufficient to justify its subsequent recourse to wiretapping. We agree with the district court, however, that no such techniques were ever attempted against any of the other defendants in the present case, nor was the government's failure to do so explained in terms adequately particularized to the facts of the case at hand.

*Castillo–Garcia*, 117 F.3d at 1196.

Despite the foregoing language, the *Castillo–Garcia* court upheld wiretaps in which particularized necessity showings were not made as to defendants who were named as users, interceptees, or not named as either. Rather, the Court identified Rosario Portillo–Rodriguez, Ceferino Castillo–Garcia, and Jaime Olivas–Sanchez as the targets of the government's wiretap applications. Then the Court measured the adequacy of "necessity"

for the wiretaps against the investigative techniques used in connection with these three defendants only.

Defendants argue that the Tenth Circuit panel deciding *Castillo–Garcia* was confused and misapplied its own rule. However, the same day that *Castillo–Garcia* was issued, the Court also issued *United States v. Killingsworth*, 117 F.3d 1159 (10th Cir.1997) in which the panel upheld the District Court's denial of a motion to suppress evidence obtained via a wiretap.

Killingsworth and a co-defendant were named in a sixteen count drug and weapons indictment. The indictment was returned after a lengthy investigation into the "Bustos Organization," a drug distribution ring operating in Oklahoma City. *Id.* at 1160. Incriminating information underlying the indictment was gathered through wiretap surveillance of two telephone lines subscribed to by Steve Schardein and Jill Knight, suspected members of the "Bustos Organization."

Killingsworth moved to suppress the wiretap evidence claiming, inter alia, that the government failed to show necessity for the surveillance and that the authorization order was insufficient on its face because he was not named as a target in the wiretap application. *Id.* at 1160–61. The District Court denied Killingsworth's motion to suppress concluding that the government had established necessity based on investigative efforts made against the "Bustos Organization." *Id.* at 1161.

Echoing *Castillo–Garcia*, the *Killingsworth* court expressly held that "[t]o obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried *against the target* of the wiretap." *Id.* at 1163 (emphasis added). In determining the adequacy of the necessity requirement in the wiretap application, the *Killingsworth* court evaluated the investigative efforts taken against the "Bustos Organization." *Id.* at 1163–64. While there were references to "suspected members of the Bustos Organization," the Court's focus was on the "Bustos Organization" as a target, not individuals. Further, it was to no avail that Killingsworth

was not mentioned in the wiretap application or authorization order. In affirming the District Court's denial of Killingsworth's motion to suppress evidence obtained as a result of a wiretap, the Court stated that "the mere fact that neither the wiretap application nor the authorization order mentioned Killingsworth by name does not render the interception of communications to which Killingsworth was a party unlawful." *Id.* at 1165.

A month later, the Tenth Circuit issued its unpublished opinion in *United States v. Bovie*, 120 F.3d 271, 1997 WL 423114 (10th Cir.1997). In *Bovie*, the Court upheld the District Court's denial of Bovie's motion to suppress wiretap evidence. In evaluating the necessity requirements, the Court referred consistently to the investigative techniques tried against the "target of the wiretap" and the "primary targets." Bovie's role in the conspiracy was discovered through the authorized wiretaps of one of the primary targets of the drug conspiracy. *Id.*

■ I glean from *Castillo–Garcia, Killingsworth*, and *Bovie* that as to necessity, the investigative targets of a wiretap application may be individuals as well as criminal organizations. Moreover, the failure to name all persons subject to a wiretap does not render the wiretap unlawful. *Killingsworth*, 117 F.3d at 1159, n. 4 citing *United States v. Kahn*, 415 U.S. 143, 154–55 and n. 5, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

■ In these three wiretap cases, the Tenth Circuit required particularized necessity showings only as to the primary targets of the investigation. A primary target may be the conspiracy or criminal enterprise itself.

■ I am bound by Tenth Circuit precedent unless overruled en banc or superseded by a contrary Supreme Court decision. *See Haynes v. Williams*, 88 F.3d 898, 900 n. 4 (10th Cir.1996); *United States v. Spedalieri*, 910 F.2d 707, 709, n. 2 (10th Cir.1990). If I were writing on a clean slate, I would finding inviting defendants' construction of Title III as requiring particularized necessity showings as to all named users and intercep-

tees. There is also merit to their argument that omission from the application of individuals for whom probable cause exists may skew an issuing judge's determination of necessity. The danger inherent in the government's position is that it renders unto itself definition of the "primary targets" and, thus, ability to manipulate its ability to meet its burden of showing necessity. However, I am constrained by *Castillo–Garcia* and its progeny to conclude that the government is required to make specific necessity showings only as to the primary targets of the wiretaps.

## IV.

 Viewing the wiretaps in this case in a practical and common-sense fashion, under the totality of the circumstances, I find and conclude that the primary targets of the wiretaps were R. Rojas–Cabral, Barrios, and the drug conspiracy itself. Careful reading of the applications for the wiretaps and extensions authorized in this case leads me to conclude that particularized showings of necessity are made as to all wiretap targets.

### A. *WT–3—February 4, 1997*

The individual primary targets of WT–3 were R. Rojas–Cabral and Barrios. The devices to be monitored in WT–3 were two pagers. The first pager was assigned telephone number (303) 760–8366. It was subscribed to by Rigoberto Ramirez and used by R. Rojas–Cabral. The second pager had telephone number (303) 851–0894. Its subscriber was Dana Victor Pena and was used by Barrios.

In the affidavit supporting the first wiretap application, Denver Detective Simmons (Det.Simmons) stated that the goals of WT–3 were to obtain: 1) information leading to the identification of the individual(s) supplying R. Rojas–Cabral and Barrios with cocaine, methamphetamine, and marijuana; 2) information leading to the identification of person(s) distributing the illicit drugs on behalf of R. Rojas–Cabral, Barrios, and others yet unknown; 3) information leading to the identification of times and locations of meetings during which R. Rojas–Cabral, Barrios, and others yet unknown provide to others yet

unknown the drugs for distribution. WT–3 affidavit ¶ 5(a)(1–4). Det. Simmons explained that physical surveillance of the primary targets of the investigation, R. Rojas–Cabral and Barrios, failed to reveal the full scope of the drug organization. Also, R. Rojas–Cabral and Barrios refused to deal with undercover agents. *Id.* at ¶ 31. Det. Simmons opined that to identify a witness with complete and full knowledge of the scope of the conspiracy would require round-the-clock surveillance which would likely jeopardize the investigation within a brief period of time. *Id.* at ¶ 34.

Det. Simmons disclosed that confidential source number 1 (CS–1) had provided reliable information to Detective Tabares that R. Rojas–Cabral, Barrios, Genaro Rivera, and Rogelio LNU were involved in the importation and distribution of illicit drugs in the Denver, Colorado metropolitan area. ¶ 10. This information was corroborated as to R. Rojas–Cabral and Barrios through physical surveillance, controlled buys between CS–1, R. Rojas–Cabral, and Barrios and introduction of an undercover police officer to R. Rojas–Cabral and Barrios. *Id.* However, CS–1 felt that providing testimony or becoming publicly involved would result in retaliation against CS–1 or CS–1's family because both R. Rojas–Cabral and Rivera carried weapons. Also, R. Rojas–Cabral stated many times to CS–1 that if anyone were to inform on him, R. Rojas–Cabral would kill the person(s) or have them killed. *Id.*

CS–1 told Det. Tabares that Rivera traveled to California to meet with his drug supplier to purchase the illicit drugs and hire couriers to transport the drugs to the Denver metro area by automobiles. CS–1 also told Det. Tabares details about the managerial methods employed by R. Rojas–Cabral and Rivera in operating the drug distribution operation. *Id.* at ¶¶ 11–12. However, Det. Simmons explained that the use of confidential sources was of limited value because they were unable to obtain significant information about the source of the drugs and the scope of the conspiracy. *Id.*

Det. Simmons explained that search warrants were of limited value because it was unlikely that drug records obtained through a successful search would be useful against persons not present at the time of the search. *Id.* at ¶ 37. Further, it was doubtful that the information obtained during the execution of search warrants would reveal the entire scope of the conspiracy or the identities and roles of unidentified co-conspirators. *Id.*

Det. Simmons stated that information obtained as a result of pen registers, trap and trace, and toll records provided circumstantial evidence only that the telephone had been used by the subscribers to the numbers. This type of information does not disclose the nature or purpose of the communications. Nor do telephone records and pen register data provide information as to the identity of the person placing a call to the subject of the investigation. *Id.* at ¶ 35. Det. Simmons stated that the use of various alternative investigative techniques conducted during the initial pager interception period had not identified the scope of the drug distribution organization.

On February 4, 1997, Judge Sparr conducted a hearing on WT–3. During the hearing, he questioned Det. Simmons about the exhaustion of normal investigative procedures. Transcript, 97–WT–3–S, pp. 6–7, 16–19. Det. Simmons testified that normal investigative procedures had not been productive in accomplishing the purposes of the investigation. *Id.* In accordance with 18 U.S.C. § 2518(3)(c), Judge Sparr found that normal investigative procedures had been tried until they failed, they reasonably appeared unlikely to fully succeed if tried, or were too dangerous to employ. *Id.* at p. 11.

### 1. *WT–3 first extension—March 5, 1997*

In his affidavit supporting an application for an extension of WT–3, Det. Simmons related the information obtained as a result of the interceptions of the pager and telephones authorized in WT–3. WT–3 extension affidavit ¶¶ 10–19. Simmons also averred that although use of the various investigative techniques was successful in producing evidence which could be used to prosecute Barrios, the techniques had failed to identify the

source of the drug supply, the identity of other co-conspirators, and the full scope of the conspiracy. *Id.* at ¶¶ 22–23.

### 2. *WT–3 second extension—April 3, 1997*

In his affidavit in support of the application for a second extension of WT–3, Det. Simmons again updated the information obtained as a result of the communications intercepted on the authorized wiretaps. WT–3 second extension affidavit ¶¶ 17–25. Det. Simmons stated that undercover Det. Tony Ventura had talked directly to R. Rojas–Cabral and Barrios but that they had refused to deal with him. *Id.* at ¶ 29. Det. Simmons then reviewed various normal investigative techniques and stated why they had failed or been of limited value, if tried, or not tried because of the unlikelihood of success or danger to the investigation or the officers or witnesses involved.

## B. *WT–4—March 11, 1997*

The target of WT–4 was R. Rojas–Cabral. The device to be monitored was a pager with the telephone number (303) 505–0387 subscribed to by Dana Victor Pena but used by R. Rojas–Cabral. Det. Tabares was informed by CS–1 that this pager served as a replacement pager for R. Rojas–Cabral after he discarded his first pager in an attempt to avoid law enforcement investigation. WT–4 affidavit, ¶ 15. The WT–4 application incorporated by reference the application for WT–3 and disclosed additional information. *Id.* at ¶ 9.

In the WT–4 affidavit, Det. Simmons detailed the information developed from the interceptions authorized in WT–3. First, Det. Simmons stated that the law enforcement team had identified a pattern by which R. Rojas–Cabral would page Barrios and use a code together with a return number. Also, interceptions on one of the subject pagers in WT–3 resulted in linking defendants Arciniega–Barcenas, Gutierrez, and A. Rojas–Cabral to the conspiracy. In detailing the need for WT–4, Det. Simmons stated that normal investigative procedures were successful to a limited extent to produce evidence which

could be used to prosecute R. Rojas–Cabral. However, there continued a need to identify the source of the drugs, identity of other co-conspirators, and the full scope of the conspiracy. *Id.* at ¶ 19. Undercover Det. Tony Ventura was able to talk directly with R. Rojas–Cabral but R. Rojas–Cabral refused to deal with him. *Id.* at ¶ 20. This contact did not reveal the scope of the operation and the involvement and function of other members. *Id.* Det. Simmons stated that to date, no witness with any present knowledge of the scope of the drug distribution network had been identified.

Det. Simmons reviewed the various investigative techniques used, described the pitfalls of surveillance, search warrants, grand jury investigations, the use of confidential sources, and the dearth of information derived from pen registers, telephone records, and trap and trace devices. *Id.* at ¶¶ 20–26.

During the WT–4 application hearing conducted by Judge Sparr on March 11, 1997, Det. Simmons discussed two confidential sources who told the officers that R. Rojas–Cabral and Barrios were bringing in drugs and using their pagers in the distribution of the drugs in Colorado. Transcript, 3/11/97 p. 6. The assistant United States attorney further informed Judge Sparr that there was a live surveillance camera in use at a suspected "stash house" showing persons coming and going. *Id.* at p. 11. Judge Sparr asked Det. Simmons "If you have gotten all of this information, why don't you have enough? What do you need now that you need another [wiretap].?" *Id.* at p. 8. Det. Simmons stated that they had not "fully identified all of the participants or the full scope of this investigation at this point." *Id.* at 8–9.

### 1. *WT–4 first extension—April 9, 1997*

In Det. Simmons' affidavit supporting an extension application for WT–4, Det. Simmons stated that normal investigative techniques had been attempted and to date had failed to reveal the full extent of the drug distribution network, sources of supply and the locations of the drugs actually distributed in Colorado. WT–4 extension affidavit ¶ 4(c). Det. Simmons related the information obtained as a result of the interceptions authorized in WT–4 including the identification of defendants Cristobal Rojas and Ronald Eenhuis as possible participants in the conspiracy. Also, interceptions were made from a telephone number subscribed to by defendant Arciniega–Barcenas. The police obtained further information about code numbers used in communications to the pagers. Det. Simmons stated that although use of the various investigative techniques was successful in producing evidence which could be of use to prosecute defendant R. Rojas–Cabral, the evidence did not appear to be sufficient for the successful prosecution of all of R. Rojas–Cabral's customers, suppliers and co-conspirators. *Id.* at ¶ 34.

### C. *WT–5—March 24, 1997*

WT–5 was the first wiretap seeking interception of telephonic voice communication for cellular telephones directly associated with R. Rojas–Cabral and Barrios. The primary individual targets were R. Rojas–Cabral and Barrios. As before, the wiretap continued to target the conspiracy. The telephones sought to be wiretapped were (303) 548–4330 and (303) 916–9405 subscribed to respectively by Mary Acevedo and Alicia DeChairez. In contrast to WT–3 and WT–4, there were twelve persons listed as users and interceptees.

In his affidavit in support of the application for WT–5, Det. Simmons again detailed the physical surveillance that had been conducted. He explained that the surveillance efforts were unsuccessful because the full nature and scope of the conspiracy could not be determined through the use of surveillance alone. WT–5 Affidavit at ¶ 81. Det. Simmons described that on several occasions, the conspirators had taken various steps to evade physical surveillance including evasive and high speed driving. Id. Simmons also noted that the suspects were being watchful and cautious.

Det. Simmons stated that five confidential sources had been used in the investigation of the drug conspiracy. He detailed the information received from CS–1, *id.* at ¶¶ 20–24, CS–2, *id.* at ¶¶ 25–26, CS–3, *id.* at ¶¶ 27–28,

CS-4, *id.* at ¶¶ 29–30, and CS-5, *id.* at ¶¶ 31–32. With the exception of one transaction, *id.* at ¶ 34, these informants were unable to introduce an undercover officer to conspirators for the purpose of making a direct drug purchase. Also, the informants feared reprisal for their direct testimony against any of the conspirators. Det. Simmons related that CS-1 appeared to have joined the conspiracy during, or possibly before, the first interception authorization, thus confirming the limited use of informants. *Id.* Moreover, the informants had knowledge only of limited aspects of the organization and could not identify its complete parameters. *Id.* at ¶ 81. Further, undercover agents had been unable to infiltrate the inner workings of the conspiracy due to the close and secretive nature of the organization. Det. Simmons explained that infiltration of the organization by undercover officers through the confidential sources was not feasible because the confidential sources were not in a position to introduce undercover agents to mid-level or high-level individuals in the organization. *Id.*

Det. Simmons stated that search warrants were of limited value since the conspirators "have insulated themselves and their residences in such a way that rarely would a person get into a position to develop information upon which probable cause for a search warrant of one of their residences could be developed." *Id.* Det. Simmons stated that some of the information provided by the informants could, if corroborated, form probable cause to search certain locations. However, even if drugs or drug records were recovered, such seizures would be of limited value against persons not present at the time of the search. *Id.* Also, Det. Simmons stated that it was unlikely that detailed information would be obtained through search warrants alone that would result in a determination of the complete scope of the drug dealing activities or the identities and roles of all co-conspirators. *Id.* at 81.

Det. Simmons disclosed the extensive use of pen registers, trap and trace, and toll information during the investigation. However, as before, the information was of limited use because it could not reveal identities of the parties or the subject matter of the calls. *Id.* Det. Simmons further explained that undercover operations had not been attempted since WT–5 interceptions began because there had been no new opportunities to infiltrate the organization. Also, witnesses with information about the drug operation were confined to lower level participation. Further, use of the grand jury was considered and rejected because there was little likelihood that the subpoenas would result in knowledge of the scope of the entire conspiracy. *Id.*

During the WT–5 hearing held on March 24, 1997, Judge Sparr asked Det. Simmons questions about the investigation and discussed at length the information contained in Simmons's affidavit including the minimization plan for intercepting conversations. *See* Transcript, WT–5 hearing.

### 1. WT–5 first extension—April 23, 1997

In Det. Simmons' affidavit in support of the application for an extension of WT–5, Det. Simmons updated the information obtained as a result of the communications intercepted on the authorized wiretaps. Det. Simmons stated he believed that CS–1 was currently involved with the targets of the investigation in illegal drug distribution or attempted possession with intent to distribute the illegal drugs. WT–5 first extension affidavit ¶ 10. The investigators were able to identify two or three additional co-conspirators but there were several persons connected with the organization with "last names unknown." Transcript ¶ 25. Det. Simmons detailed significant information learned about the conspiracy's operation including arrangements to transport drugs from California to Colorado. However, much of the information intercepted concerned persons with "last names unknown." Det. Simmons again reviewed the various normal investigative techniques and stated why they had failed or been of limited value, if tried, or not tried because of the unlikelihood of success or danger to the investigation or the officers or witnesses involved. Det. Simmons stated that it was essential for investigators to continue the interception to fully achieve the

objectives of the investigations. Also, Det. Simmons stated that CS–1 was no longer reliable, CS–2 and CS–3 were "no longer active," CS–4 was limited to dealing with Barrios, and CS–5 had been unable to penetrate further into the organization. *Id.* at ¶ 26, p. 40.

During the *in camera* extension hearing held on April 4, 1997, Det. Simmons testified about a search conducted on a Chevrolet Nova that had occurred between the time Simmons had signed the affidavit and the hearing. Based on information gained from the wiretap, the officers seized the automobile and recovered approximately 2 kilograms of methamphetamine. After this search and seizure, there was conversation on the wiretap between R. Rojas–Cabral and an unidentified person in California about another automobile expected in Denver.

### D. *WT–7—April 16, 1997*

In the affidavit supporting the application for WT–7, Det. Simmons explained that R. Rojas–Cabral had stopped using the telephone number that was the subject of one of WT–5's orders and had replaced it with telephone number (303) 921–2191. WT–7 affidavit ¶ 6. Det. Simmons summarized numerous telephone calls which had been intercepted between March 25, 1997, and April 10, 1997. These calls confirmed that the conspirators continued to distribute illegal drugs in the Denver metropolitan area. Aff. ¶¶ 12–19. Det. Simmons related that physical surveillance had been somewhat successful. However, on April 4, 1997, during surveillance of an individual driving R. Rojas–Cabral's green Cadillac to Pueblo, Colorado, the driver began doing "burn runs," described as "driving evasively in order to detect law enforcement." *Id.* at ¶ 22, p. 28. Det. Simmons further related that on March 28, 1997, a vehicle believed to be transporting money to California had been searched with negative results. *Id.* at ¶ 11; ¶ 22, p. 33.

In the *in camera* hearing held on the application for WT–7, Det. Simmons testified that through the wiretaps in place, they discovered that R. Rojas–Cabral had discontinued using one telephone and acquired another phone to conduct his drug business.

Judge Sparr also asked Det. Simmons what other investigative methods he had attempted other than the wiretap. Det. Simmons then briefly reviewed the use of surveillance, confidential sources, undercover agents, grand jury investigations, and search warrants.

For each wiretap application and extension, Judge Sparr found in accordance with 18 U.S.C. § 2518(3)(c), that normal investigative procedures had been tried until they failed, they reasonably appeared unlikely to fully succeed if tried, or were too dangerous to employ.

### V.

An application for a wiretap authorization must meet the necessity requirements set forth in 18 U.S.C. § 2518. A wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See id.; United States v. Quintana,* 70 F.3d 1167, 1169 (10th Cir.1995). Also, the judge authorizing the wiretap must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

 In *Castillo–Garcia,* the Tenth Circuit specified four categories of normal investigative procedures that the government must address in its wiretap application:

(1) standard visual and aural surveillance;

(2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary);

(3) use of search warrants; and

(4) infiltration of conspiratorial groups by undercover agents or informants.

*Castillo–Garcia,* 117 F.3d at 1187. The government must also address the use of pen registers and trap and trace devices. *Id.* In its application, the government is required to explain with particularity what investigative techniques have been tried against the wire-

tap target and why any untried techniques would be either unsuccessful or too dangerous. *Id.* However, the government does not need to exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretaps. Rather, the government is required to show exhaustion of all "reasonable" investigatory methods, either by attempting them or explaining why the method would not work. *Id.* at 1188.

Moreover, the *Castillo–Garcia* court explained that:

> where the government's stated explanation for its use, or failure to use, normal investigative techniques clearly encompasses each of these categories and any other normal investigative techniques that may be applicable to the circumstances, it is not necessary for the government formally to address each category with an explanation. *United States v. Mesa–Rincon,* 911 F.2d 1433, 1444 (10th Cir.1990). Thus, the government's failure explicitly to explain its failure to utilize one or more specified categories of normal investigative techniques will not be fatal to its wiretap application if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable.

*Castillo–Garcia,* 117 F.3d at 1188.

Here, in each of the affidavits in support of the applications for the wiretaps and extensions, Det. Simmons provided specific details, factual in nature, of the government's extensive, repeated, and numerous investigative efforts. In response to questioning by Judge Sparr during each of the *in camera* wiretap hearings held, Simmons also elaborated on the investigative efforts.

Defendants characterize as "boilerplate explanations" recitations by Det. Simmons which contain the same information and language in each of the affidavits. However, the use of identical language is inevitable in a case involving an extensive, long-term investigation involving multiple wiretaps operating simultaneously. Also, each of the affidavits incorporate the previous affidavits filed.

What is determinative, however, is whether there is particularized additional information contained in new applications for wiretaps or extensions of existing wiretaps. *Castillo–Garcia,* 117 F.3d 1179, 1190.

Although predicated in part on information contained in previous affidavits, each affidavit submitted in this case contains new and particularized information about the suspected drug conspiracy and its workings. *See* section IV., *supra.* Each affidavit reviewed the normal investigative techniques employed and, as pertinent, the futility, disadvantages, or dangers of them. Unlike the third wiretap application in *Castillo–Garcia,* the wiretap and extension applications and affidavits here do not rely on "wholly conclusory language." *Id.* at 1194. Critically, each application and affidavit contains information, factual in nature, particular to the primary targets of the wiretaps. Accordingly, the government has satisfied the § 2518 necessity requirements with respect to each wiretap and extension obtained in this case.

## VI.

Also pending are the motions to suppress wiretap evidence for absence of probable cause filed by defendants Ronald Eenhuis, Jose Angel Gutierrez, Santos Rojas, and Arturo Rojas–Cabral. For the following reasons, I will deny the motions.

The probable cause required for the issuance of a wiretap order is the belief that a particular offense has been, is being, or is about to be committed, and that conversations related to the offense will be overheard. 18 U.S.C. § 2518(3)(b). *United States v. Armendariz,* 922 F.2d 602, 608 (10th Cir.1990). The focus of the probable cause determination is the targets of the wiretaps. *Id.* The task of the judge in evaluating a warrant application is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit in support of the application, including the veracity and basis of knowledge of the affiant, there is a fair probability that evidence of the suspected crime will be found. *See Illinois v. Gates,* 462 U.S. 213,

232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). One of the factors to be considered is the affiant's experience and expertise. *United States v. Soussi,* 29 F.3d 565, 569 (10th Cir. 1994).

 In this case, the targets of the investigation were R. Rojas–Cabral, Barrios, and the suspected drug conspiracy itself. Det. Simmons is an experienced narcotics officer with twenty-five years experience as a Denver Police Department police officer, eighteen of which have been with the narcotics division. As outlined above, in each affidavit, Det. Simmons presented ample evidence to support Judge Sparr's determination that there was probable cause to believe that an ongoing conspiracy involving R. Rojas–Cabral and Barrios existed to distribute cocaine, marijuana, and methamphetamine in part via the targeted pagers and telephones. Because the defendants filing the motions to suppress were not targets of the wiretaps, a probable cause showing as to them was not required. It is sufficient that probable cause existed as to R. Rojas–Cabral, Barrios and the drug conspiracy.

### VII.

A. *Failure to name defendants Arciniega–Barcenas and Rivera in WT–3 and WT–4*

Defendants Arciniega–Barcenas and Rivera move to suppress evidence obtained in WT–3 and WT–4 for failure to name them as potential interceptees in those wiretaps. They then seek to suppress evidence obtained in WT–5 and WT–7 as "tainted" by the omissions from WT–3 and WT–4. Because the WT–3 and WT–4 orders were lawful, WT–5 and WT–7 were not tainted.

1. *defendant Arciniega–Barcenas*

 The applications for both WT–3 and WT–4 described the arrest of Arciniega–Barcenas and the seizure of a kilogram of cocaine on November 22, 1996. The government does not dispute that as a result of this arrest as well as the pen register information outlined in the WT–3 and WT–4 applications, there was probable cause to believe Arciniega–Barcenas was engaged in the criminal

activity under investigation and that his communications would be intercepted in the wiretaps. Despite the existence of probable cause as to Arciniega–Barcenas, the applications for WT–3 and WT–4 did not name him as a target or interceptee.

In *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), the Supreme Court held that 18 U.S.C. § 2518(1)(b)(iv) requires that "a wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." *Id.,* 429 U.S. at 427. Thus, Arciniega–Barcenas should have been named in WT–3 and WT–4. However, *Donovan* holds that the failure to comply fully with the § 2518(1)(b)(iv) identification requirement does not render unlawful an intercept order that in all other respects satisfies the statutory requirements. *Id.* at 433–34. The Court reasoned that:

> if, after evaluating the statutorily enumerated factors in light of the information contained in the application, the judge concludes that the wiretap order should issue, the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization.

*Id.* The Court then addressed whether the failure of the law enforcement authorities to comply fully with § 2518(1)(B)(iv) prohibits the use at trial of the contents of the intercepted wire communication or any evidence derived therefrom. *Id.* at 432.

The circumstances that trigger suppression are:

> (i) the communication was unlawfully intercepted;

> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a).

Here, as in *Donovan*, there is no basis to suggest that the authorization orders are facially insufficient or that the interception was not conducted in conformity with the orders. Thus, only § 2518(1)(a)(i) is pertinent.

 "Not every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *Donovan*, 429 U.S. 413, 433, 97 S.Ct. 658, 50 L.Ed.2d 652 *quoting United States v. Giordano*, 416 U.S. 505, 524–25, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Rather, suppression is required only for:

> failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

*Id.* at 527.

Here, as to § 2518(1)(b)(iv), the issue is whether the failure to name Arciniega–Barcenas as an interceptee in WT–3 and WT–4 "play[ed] a 'substantive role' with respect to judicial authorization of intercept orders." *Donovan*, 429 U.S. at 435. The Intercept order is lawfulonly if it is determined that the statutory factors are present, and the failure to name Arciniega–Barcenas in no way detracts from the sufficiency of those factors. *See id.*

As in *Donovan*, in WT–3 and WT–4, the statutorily imposed preconditions to judicial authorization were satisfied. *See* sections IV. and V., *supra.* Naming additional interceptees, including Arciniega–Barcenas, would not have precluded judicial authorization of the wiretaps. *See id.* at 436. Indeed, rather than keeping relevant information about Arciniega–Barcenas from Judge Sparr, the applications and affidavits disclosed his November 22, 1996 arrest. WT–3 Affidavit, ¶ 21; WT–4, Ex. A, ¶ 21. Therefore, although pursuant to § 2518(1)(b)(iv), the government was required to identify Arciniega–Barcenas as an interceptee in WT–3 and WT–4, under the circumstances here, failure to do so does not warrant suppression under § 2518(10)(a)(i). *Id.* at 439. Accordingly, I will deny the suppression motions based on failure to name Arciniega–Barcenas in WT–3 and WT–4.

### 2. *defendant Rivera*

In WT–5, the government, for the first time, named Rivera, among others, as a user and interceptee of the telephones sought to be wiretapped. Also for the first time, in its application and affidavit for WT–5, the government disclosed in detail collective and corroborative information supplied by the five confidential sources as to Rivera's role as a source of supply for R. Rojas–Cabral's and Rivera's method of operation.

During the wiretap motions hearing, Det. Simmons testified that at the time of the application for WT–3, the pager number provided by CS–2 for Rivera had been disconnected. Simmons Testimony, pp. 174–75. Likewise, when WT–3 was sought, the telephone number for Rivera provided by CS–2 was no longer active. Also, the police had conducted physical surveillance and camera surveillance of a "stash house" in the fall of 1996 but Rivera was never seen at the location. Simmons Testimony pp. 140–141. Thus, although the confidential sources corroborated each other in several aspects, there was no independent corroboration of the confidential sources' information about Rivera's role in the drug conspiracy.

When WT–3 and WT–4 were executed, it was discovered that there was pager activity between R. Rojas–Cabral and Rivera. Given this independent evidence linking Rivera to R. Rojas–Cabral, when the police applied for WT–5 and WT–7, they included the full confidential source information about Rivera.

The same analysis employed in assessing the effect of failing to name Arciniega–Barcenas as a target or interceptee in WT–3 and WT–4 attends to the omission of Rivera in WT–3 and WT–4 with the same result. As stated, the statutorily imposed preconditions to judicial authorization were present in WT–

3 and WT–4. *See* sections IV. and V., *supra.* Naming additional interceptees, including Rivera, would not have precluded judicial authorization of the wiretaps. *See id.* at 436. Although Rivera was not named as a user or interceptee, Judge Sparr was informed that Rivera was involved in the operation, WT–3 affidavit, ¶ 10, and that he had a role in providing the drugs to the conspiracy. *Id.* at ¶¶ 11–12. Therefore, although pursuant to § 2518(1)(b)(iv), the government was required to identify Rivera in WT–3 and WT–4 because probable cause existed as to him, under the circumstances here, failure to do so does not warrant suppression under § 2518(10)(a)(i). *Donovan*, 429 U.S. at 439. Accordingly, I will deny the suppression motions based on failure to name Rivera in WT–3 and WT–4.

B. *Failure to set forth full confidential source information in WT–3 and WT–4 as to defendant Rivera*

Defendants seek to suppress evidence obtained from WT–3 and WT–4 based on the undisputed failure to include in the WT–3 and WT–4 applications and affidavits, information that confidential sources identified defendant Genaro Rivera as the drug supplier for the drug distribution organization under investigation. For the following reasons, I will deny the motions.

Title III, 18 U.S.C. § 2518(1)(b), states that the application for interception of wire, oral, or electronic communication shall include:

a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed....

18 U.S.C. 2518(1)(b)(i). It is undisputed that the information supplied by the five confidential sources set forth in WT–5 and WT–7, although known by police, was omitted from the applications and affidavits for WT–3 and WT–4.

Interception of the communications to the paging devices in WT–3 and WT–4 sought to disclose:

1. information leading to the identification of the individual(s) supplying R. Rojas–Cabral and Barrios with controlled substances (cocaine, methamphetamine and marijuana);

2. information leading to the identification of person(s) distributing controlled substances (cocaine, methamphetamine and marijuana) on behalf of R. Rojas–Cabral, Barrios, and others yet unknown;

3. information leading to the identification of time(s) and location(s) of meetings during which R. Rojas–Cabral, Barrios, and others yet unknown, provide to others yet unknown, controlled substances (cocaine, methamphetamine and marijuana) for distribution;

4. the identification of other communication facilities used by R. Rojas–Cabral, Barrios, and others yet unknown, in furtherance of the criminal activity alleged herein.

WT–3 and WT–4, Simmons Aff. ¶ 5 B. Det. Simmons' affidavits stated that "normal investigative techniques have been attempted and to date have failed to reveal the full extent of the named individual's distribution network, sources of supply and the locations of quantities of cocaine, methamphetamine and marijuana actually distributed in Colorado."

Defendants argue that the admitted failure to disclose the information that confidential sources had identified Rivera as the source of the drugs requires suppression of the wiretap evidence on two separate grounds—violation of the necessity requirements of Title III and traditional Fourth Amendment jurisprudence applicable to material omissions in warrant affidavits. I disagree.

1. *Necessity*

It is undisputed that although Det. Simmons averred in the WT–3 and WT–4 affidavits that the police were seeking the sources of the drugs, he also knew that a number of confidential sources identified Rivera as a source of the drugs being distributed by the organization under investigation. It is clear that Det. Simmons did not disclose

all of this information to Judge Sparr in the WT–3 and WT–4 affidavits or in the *in camera* hearings. Thus, when he made necessity findings on WT–3 and WT–4, Judge Sparr did not possess all of the information known about the full extent of Rivera's purported role in the drug organization.

 To obtain a wiretap, the government must show that it needs the wiretap to obtain information it is unable to obtain without it. *See United States v. Ippolito,* 774 F.2d 1482, 1486 (9th Cir.1985). Specificity is required to prevent the government from making general allegations about classes of cases and thereby avoid the requirement that there be necessity in the particular investigation in which the wiretap is sought. *Id.* The affidavit must show with specificity why in the particular investigation ordinary means of investigation will fail. *United States v. Robinson,* 698 F.2d 448, 453 (D.C.Cir.1983).

Assuming lack of showing necessity to discover Rivera as a source of the drugs, WT–3 and WT–4 still show necessity to learn the identity of higher sources. Notably, there was an abundant showing of necessity in the WT–3 and WT–4 affidavits to obtain information about, *inter alia,* the identities of all the members of the drug organization including the couriers and the dealers, the locations of the drugs, the identification of other communication devices being used by the drug conspiracy, and the location of the organization's assets. Thus, even without complete disclosure of the confidential source information about Rivera's role as one of the sources of the drugs, there was still adequate necessity for WT–3 and WT–4.

2. *False statement or omission of material information in an affidavit*

 Under Fourth Amendment law, when an affidavit contains a false statement or an omission, probable cause is re-assessed after the false information is corrected or deleted and the information omitted is added. If there is no probable cause, evidence derived from the search and seizure implemented as a result of the warrant issued based on the deficient affidavit must be suppressed. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Although the Tenth Circuit has not addressed the applicability of a *Franks* analysis in the context of a wiretap order, several circuits have addressed omissions from and falsehoods in an application and affidavit for a wiretap. *United States v. Bianco,* 998 F.2d 1112 (2d Cir.1993); *United States v. Sobamowo,* 892 F.2d 90, 93 (D.C.Cir.1989); *United States v. Leisure,* 844 F.2d 1347, 1357 (8th Cir.1988); *United States v. Cole,* 807 F.2d 262 (1st Cir.1986); *United States v. Ippolito,* 774 F.2d 1482 (9th Cir.1985).

In the case of an omission in a wiretap application and affidavit, most courts have held:

> it is necessary to evaluate the hypothetical effect of knowledge of the existence of [the omitted information] on the original district court's determination that a wiretap was necessary. If it would have no effect, then the misstatement would not be material.

*Ippolito* at 1485–86. *See also United States v. Simpson,* 813 F.2d 1462, 1472 (9th Cir. 1987) (if full details about omitted information were known to issuing judge, suppression would be necessary if a reasonable District Court judge could have denied application because necessity for wiretap order had not been shown). As stated in *Cole:*

> materiality means if the statements had been made and . . . had been in the affidavit, would the warrant necessarily, nevertheless, have issued. If it would have issued even though we knew these things, the information is immaterial.

*Id.* at 268.

Accordingly, the question is whether the omitted confidential source information had any effect on WT–3 and WT–4. The answer is in the applications for WT–5 and WT–7 which contained the omitted information. Having full knowledge of the new information, Judge Sparr found a continuing need for the wiretaps to obtain further information about the sources of the drugs, the identification of all the members of the conspiracy, and the dates of future deliveries of the illegal drugs. *See e.g.* WT–5 *in camera* tran-

script, pp. 11, 29; WT–7 *in camera* transcript, pp. 13, 14.

The only evidence before me is that Det. Simmons omitted the confidential source information about Genaro Rivera from WT–3 and WT–4 because he mistakenly believed that less of a showing was required in an affidavit in support of an application for a wiretap on a pager than for a wiretap on a telephone. *See e.g.* Simmons Transcript, pp. 86–88, 90, 109. There is no credible evidence that the omission was willfully or recklessly made to deceive or mislead Judge Sparr on the issue of necessity.

Under these circumstances, the omitted information was not material to the authorizations in WT–3 and WT–4 because its inclusion in the applications and affidavits for WT–5 and WT–7 did not change the outcome of Judge Sparr's necessity findings and authorizations for those wiretaps. *Simpson,* 813 F.2d at 1472; *Ippolito,* 774 F.2d at 1486–86. Therefore, I will deny the motions to suppress.

Accordingly, IT IS ORDERED that:

1. all defendants' motions to suppress evidence derived from wiretaps denominated 95–WT–3–S, 95–WT–4–S, 95–WT–5–S, 95–WT–7–S and any extensions of these wiretaps are DENIED.