UNITED STATES of America,
Plaintiff,

v.

**Michael Andre CRUMPTON, Lateshia Harden, Darien Hunter, and Devon Camack, Defendants.**

Nos. 96–CR–419–D, 98–CR–260–D.

United States District Court,
D. Colorado.

June 29, 1999.

---

Stephanie Podolak, Assistant U.S. Attorney, Denver, CO, for plaintiff.

Charles A. Agbakwu, Aurora, CO, Nina A. Iwashko, Canges, Iwashko & Bethke, P.C., Denver, CO, Steven M. Feder, Harold R. Bruno, III, Smith McCullough, P.C., Denver, CO, Charles W. Elliott, Denver, CO, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO DEFENDANTS' MOTIONS CHALLENGING THE USE OF INFORMATION OBTAINED THROUGH COURT AUTHORIZED WIRETAPS

DANIEL, District Judge.

THIS MATTER is before the Court on motions filed by the defendants to suppress information obtained as a result of wiretaps authorized by orders of this Court. A two day hearing was held on November 19 and November 20, 1998. This case involves a drug conspiracy that was allegedly created and implemented by the defendants. Through a Second Superseding Indictment filed on May 20, 1998, Defendant Michael Crumpton was charged with one count of knowingly and intentionally conspiring to distribute and possess cocaine and crack cocaine, three counts of knowingly and intentionally distributing and possessing cocaine and crack cocaine, one count of knowingly and intentionally attempting to possess with the intent to distribute cocaine, and one count of knowing and wilful use and possession of a firearm during and in relation to a drug trafficking crime. Defendant Lateshia Harden was charged with one count of knowingly and intentionally conspiring to distribute and possess cocaine and crack cocaine, and one count of knowingly and intentionally distributing and possessing crack cocaine. Defendant Darian Hunter was charged with one count of knowingly and intentionally conspiring to distribute and possess cocaine and crack cocaine, one count of knowingly and intentionally distributing and possessing cocaine and crack cocaine, and one count of knowing and wilful use and possession of a firearm during and in relation to a drug trafficking crime. Finally, on June 25, 1998 Defendant Devon Camack was charged with two counts of knowing and intentional use of a communications facility to commit and facilitate the commission of crack cocaine possession and distribution, and three counts of knowing and intentional possession with the intent to distribute of crack cocaine. This Order decides the suppression issues.

## FACTUAL BACKGROUND

### The Pre–Wiretap Investigation

This prosecution of these defendants emanates from the actions of the Metro Gang Task Force ("MGTF"). Case agents who worked on the investigation included FBI Special Agent Clyde Langley ("Agent Langley"), who had approximately 4 years and hundreds of hours training as a narcotics officer; Aurora Police Officer Mark Finnin ("Agent Finnin"), who had approximately 13 years training in gang and narcotics related investigations; and Arapahoe County Deputy Sheriff Shauna Volz ("Deputy Volz"). (Government's Wiretap Exhibit 1 at the hearing, ¶¶ 1–2, Transcript T. 10–12). By the summer of 1995, officials of the Sierra Vista Apartments in Aurora, Colorado informed law enforcement about large scale drug dealing and increased acts of violence on the premises. (T. 13).

To aid in the investigation, the case agents decided to enlist the assistance of Pamela Long ("Informant Long"), who was a paid confidential informant. Informant Long moved into the complex in order to make contact with those persons involved in the drug distribution activities. The case agents were aware that Informant Long had been a crack cocaine user and that some of the potential targets of the case might know her and deal with her because of her prior drug usage. (Exhibit 1, ¶ 11, T. 13–14).

Informant Long lived at Sierra Vista from approximately July, 1995, to approximately December, 1995. Informant Long's rent was paid by MGTF and she received a small monthly allowance. (T. 264). Shortly after Informant Long moved into the complex, she began providing the case agents with information about others who were distributing and supplying cocaine and crack cocaine in the complex.

By November 1995, based on information supplied by Ms. Long, the "targets" of the investigation became Larry Moore, a/k/a "Captain,"[1] and his suppliers and distributors including Ronald Johnson, a/k/a "Hollywood," Victor Handy, and Ernest L.C. Robison.[2] According to Informant Long, this group had been engaged in drug dealing since the late 1980's and was responsible for supplying large quantities of crack cocaine in Denver and Aurora, Colorado. Moore was the leader of the group, Robison was his right hand man, and Handy and Johnson arranged and brokered deals for Moore and others. (Exhibit 1, ¶¶ 12–13, T. 13–14). Informant Long learned at this time that Robison's girlfriend, Lisa Hatcher,[3] was also involved in crack cocaine distribution with Robison. This information was reported to the case agents.

Over time, Informant Long gained the trust of some of the members of the organization and was able to infiltrate to the point where she could make controlled buys of small amounts of crack cocaine. For example, in November 1995, Informant Long made a controlled purchase of 6.5 grams of crack cocaine from Robison and a purchase of 2.1 grams of crack from Handy. (Exhibit 1, ¶¶ 17, 45, T. 21). The agents conducted surveillance in connection with these controlled purchases in an effort to learn who was supplying Handy and Robison with crack cocaine. This surveillance, however, did not uncover the identity of the source(s). (Exhibit 1, ¶¶ 115–117, T. 22).

On November 29, 1995, Informant Long provided a lead on a potential source when she advised the case agents that she had driven Robison to meet with someone named "Tarzan." After the meeting, Robison showed her ¼ ounce of crack that he had purchased from Tarzan. (Exhibit 1, ¶ 118). The case agents later identified Tarzan as Thaddeus Martin, who was arrested in March 1996, for possession with the intent to distribute cocaine. Martin refused to cooperate following his arrest. (T. 22–23).

In mid-December 1995, the case agents solicited the help of a second confidential informant identified as Patricia or Patty Heck ("Informant Heck"). Like Informant Long, Informant Heck was also a former crack cocaine user who knew some of the members of the organization. Informant Heck was able to supply information about Handy, Johnson and Robison and was able to infiltrate the organization to the point where she too could buy small quantities of crack cocaine from them. For example, on December 16, 1995, Informant Heck purchased ½ gram of crack

1. Larry Moore has pled guilty and is cooperating with the government.

2. Ernest L.C. Robison was tried, convicted, and has been sentenced.

3. Lisa Hatcher has pled guilty and is cooperating with the government.

from Johnson. (Exhibit 1, ¶¶ 22–29, T. 26–27).

Although Informant Heck had provided information about an apartment that Handy, Johnson and Robison were using, the case agents concluded that they lacked probable cause to obtain a search warrant for the apartment because it was unclear who was using the apartment and whether drugs were actually being stored there. (Exhibit 1, ¶¶ 125–126). On December 27, 1996, Informant Heck set up a controlled buy from Robison and, on that day, attempted to introduce an undercover agent, Deputy Volz, to Robison. Although the controlled purchase of 2.05 grams of crack was successful, Robison became leery of dealing directly with or speaking with Deputy Volz and tried to conduct the transaction solely through Informant Heck. Robison never offered to deal with Deputy Volz independently of Informant Heck. (Exhibit 1, ¶¶ 31, 121, T. 27–28).

The case agents continued to conduct surveillances in connection with Informant Heck's activities in order to learn the identity of the drug source, but they were not successful. (Exhibit 1, ¶¶ 115–117). Although the case agents believed that they had enough information to arrest Robison based on the two controlled purchases, they decided against this course of action because they had not identified the source of drugs to Robison and others in the organization, did not know the identity of those persons in the upper echelons of the organization, and did not want to compromise the ongoing investigation. (T. 23–25).

On January 3, 1996, the case agents interviewed a third confidential informant who was identified as Derrick Everidge ("Informant Everidge"), an admitted drug dealer in the Denver area. Informant Everidge was able to provide some historical information on Johnson, Moore and Robison and was able to supply the case agents with Moore's telephone number. (Exhibit 1, ¶¶ 31–41). Informant Everidge told the case agents, however, that he should not buy from Moore because Informant Ever-

idge was in a higher position in the distribution hierarchy and to do so would look out of place and create suspicion. (T. 29–30).

In an effort to set up a controlled purchase of crack cocaine, on January 9, 1996 Informant Heck made a monitored phone call to Handy. Handy advised that Robison was due in at 3:00 a.m. on his return from California, and that another "party" was planned for the following evening. (Exhibit 1, ¶¶ 46–48, T. 30). In an effort to corroborate Informant Heck's information, the MGTF case agents arranged for Informant Long to contact Handy. During the taped conversation, Handy reiterated that Robison would be returning "with a load" around 3:00 that morning. Informant Long asked how much Robison would be picking up and Handy responded that he was unsure. Handy further stated that Robison was taking a risk flying back and forth as this was Robison's sixth crack importation trip from California. (Exhibit 1, ¶ 49, T. 30–31).

On January 9, 1996, the case agents contacted the Denver Police Narcotics team located at Denver International Airport. Officer Chavez of the Narcotics team advised that he had verified that Robison was aboard a flight to arrive from Ontario, California at 2:00 a.m. on January 10th. Surveillance was established at the airport and Agent Langley observed Robison exit the plane carrying a beige canvas Pierre Cardin shoulder bag, with the name "Lani Robison" printed on it. Robison walked into the main terminal where he was stopped by officials and asked to identify himself. He replied that he was Ernest Robison. Officers advised Robison that they believed he was carrying narcotics and asked if they could search his shoulder bag. Robison refused to consent to a search of his bag but did agree to a search of his person. The officers advised Robison that they were going to detain the shoulder bag pending the issuance of a search warrant but that he was free to leave. Thereafter, a

search warrant was obtained for the bag and a search uncovered 889.8 grams of cocaine base. However, there was nothing in the bag that revealed the source of the controlled substance. (Exhibit 1, ¶¶ 50–51, T. 31–32).

Believing that the stop and seizure of drugs from Robison would create an opening in the Moore organization, the case agents directed Informant Long to attempt closer contact with Moore. On January 12, 1996, Informant Long made a monitored phone call to Moore and discussed with him the police stop of Robison at the airport and the fact that Robison seemed to be out of the picture. Informant Long further complained that she did not feel safe dealing with Robison anymore, and Moore responded by indicating that he would take care of her directly. (T. 34). On January 30, 1996, Informant Long made a controlled buy of crack cocaine from Moore, and in the winter months of 1996, she began directly purchasing crack cocaine from Moore, becoming closer to him and others in his organization. Specifically, Informant Long began to assist Moore by driving him to meetings with his customers and suppliers and by helping him place telephone calls to people in the organization.

During this period, Informant Long supplied the case agents with whatever information she could gather without violating the secrecy of the investigation. (Exhibit 1, ¶¶ 56–58, T. 34–35). For example, Informant Long provided information about a woman identified as Donna Norris, a/k/a "Dee," [4] who was distributing crack cocaine out of the Traveler's Inn and other motels for Moore. Informant Long also provided information as to Norris' apartment at 112532 East Kansas Drive. However, none of the information provided by Ms. Long established sufficient probable cause to justify search warrants for any location used by Moore or Norris. (Exhibit 1, ¶ 55, T. 34–35).

On February 13, 1996, Informant Long advised the case agents that Moore had been stopped by the police and that approximately $500 worth of crack cocaine had been seized from him. At this time, Moore threatened Informant Long and said that if he found out she was working for law enforcement, he would kill her. Taking this threat seriously, the case agents became reluctant to introduce new confidential informants into the organization. (Exhibit 1, ¶¶ 59, 119, T. 35–37).

In March 1996, the case agents applied for and received authorization to install pen registers and trap and trace devices on telephones being used by Moore and Handy. The pen registers were successful in that they identified other telephone numbers being called by Moore and Handy. However, they did not reveal the content of or the parties to these conversations. (Exhibit 1, ¶¶ 95–97, 99–113, T. 38–39).

On March 4, 1996, Informant Long reported that she had been driving with Moore when he went to meet his source of supply at a location just south of the Riverfalls Apartment Complex. When they reached that location Moore got out of the car and went to talk to the source. At Moore's direction, Informant Long remained in the car. (T. 325). The informant was unable to see the source clearly and could only describe him as a black male, and it was from this meeting that the case agents concluded that Moore was secretive with respect to his source. (Exhibit 1, ¶¶ 61, 115, T. 39–40, 268–270).

On March 8 and 9, 1996, Informant Long was able to provide the case agents with information relating to Moore's apartment. However, the agents believed that this information did not establish probable case to obtain a warrant for this location because drugs could not be tied to that location. (Exhibit 1, ¶¶ 64, 125, T. 40–41). As a result, on March 15, 1996, the agents attempted to supply Moore with a "chipped" cellular telephone, but this plan

---

4. Donna Norris pled guilty and is cooperating with the government.

also proved unsuccessful. (Exhibit 1, ¶¶ 66–67, 72–73, T. 41–42).

The Littleton Police stopped Moore and a woman named Lisa Hatcher on March 29, 1996, and found ten grams of crack cocaine and a crack pipe on Hatcher's person. Hatcher was a crack cocaine addict who assisted Moore in his drug distribution by driving him around town and helping him package the drugs. (Exhibit 1, ¶¶ 70–71, T. 43–44). The case agents were concerned about interviewing Hatcher because they were aware of her close relationship with Robison and Moore. Nevertheless, the agents decided to interview her in jail during which time Hatcher stated that she had driven Moore to locations where he would meet with his source. Although Hatcher had not been allowed to meet directly with Moore's source of supply, she described him as a tall, lean, black male with a deformed eye. (T. 44). Due to Hatcher's incarceration, severe crack addiction, and the belief that Hatcher would have no more success infiltrating the Moore organization than Informants Long or Heck, the case agents decided not to use Hatcher as a street informant.[5] (Exhibit 1, ¶¶ 115, 118, T. 44–45).

On April 8, 1996, Informant Long advised that she was again driving Moore around when he went to meet with his source. Like the last transaction, this deal took place at night and the Informant was unable to clearly see and identify the source. (Exhibit 1, ¶ 74, T. 46). The case agents interviewed another confidential source identified as Cynthia Sandoval on May 3, 1996, who, like Hatcher, was in jail and a crack cocaine user. Sandoval was a background informant who was able to provide historical information on Moore, Johnson and Robison. Again like Hatcher, the agents decided not to use Sandoval as

a street informant due to her incarceration, severe crack problem, and the substantial unlikelihood that she would be able to infiltrate the organization any further than the other informants. (Exhibit 1, ¶¶ 75–77, T. 44–45).

On May 13, 1996, Informant Long advised the agents that she had been driving with Moore when he asked her to page his source "Lucky," but she was not allowed to participate directly in the later transaction. (Exhibit 1, ¶ 78, T. 48–49). A month later, on June 13, 1996, Long advised that Moore was currently on his way to meet with "Lucky" to purchase a supply of crack cocaine. The informant described the vehicle Moore was in and noted two possible locations where the drug deal could occur. Surveillance was established at each of these locations and Moore was seen meeting with "Lucky" at a parking lot. Approximately two minutes after the meeting took place, "Lucky" and Moore both left the area. Surveillance agents noted that their behavior at the meeting location was consistent with a drug deal taking place. Surveillance units followed "Lucky" and arranged for a marked patrol car to stop and identify him. "Lucky" identified himself as Michael Andre Crumpton. (Exhibit 1, ¶¶ 79–80, T. 49–50). Crumpton was not arrested at this time because the agents did not believe there was sufficient evidence to sustain an indictment. (T. 50).

On June 20, 1996, Informant Long advised that Crumpton's new pager number was (303) 599–5480. The agents obtained subscriber information for this pager, but the information turned out to be fictitious. (T. 50). Informant Long further advised that Moore stated that Crumpton was going out of town and a female named "Latrisha" would handle the crack cocaine operation in Crumpton's absence. Five days

5. As a result of their training and experience dealing with crack cocaine organizations, the case agents were aware that crack users are usually at the bottom rung of a narcotics organization. They are permitted to drive the distributors and help set up deals but they are not permitted to deal with sources, front crack cocaine or have any control over it. Therefore, based on this and the way the investigation had already played out, the case agents did not believe that any of their user/informants would ever be able to deal directly with Moore's sources. (Exhibit 1, ¶¶ 115, 118, T. 25).

later, Informant Long told case agents that Moore was on his way to purchase a supply of crack cocaine. She described the car that Moore was traveling in and the location where Moore would meet his contact. Surveillance was established and at 11:30 p.m. Moore arrived at the location. At 11:29 and 11:36 p.m., two pages were received by Crumpton's pager from Moore's cellular phone, and at approximately 11:45 p.m., surveillance observed Moore meeting with a black female in a gas station at the identified location. Moore later returned to his car and left the scene. The license on the black female's car was traced to co-defendant Lateshia Harden. Surveillance units noted that Moore's and Harden's behavior at the meeting location was consistent with a drug deal taking place. (Exhibit 1, ¶¶ 82–83, T. 87–88). Based upon what had transpired, the case agents decided that there was not sufficient information to arrest Harden and that it was too dangerous to try and approach her as an informant given her close association with Crumpton. (T. 88–89).

On May 23, 1996, the case agents interviewed another informant identified as Joy Shapiro. Like the other informants, Shapiro was a crack user who knew some of the members of this organization from her past. Shapiro's role in the organization was similar to that of Hatcher, and Informants Long and Heck. Thus, the agents did not believe that she would be able to infiltrate the conspiracy and deal directly with Moore's source of supply. (Exhibit 1, ¶¶ 84–87, 75–77, T. 88–89). At this juncture, there were no new available informants. Prior informants had been unsuccessful due to their identity as crack users and their relatively low level positions in the organization. The prior informants had been unable to fully identify or deal directly with Moore's sources, or even identify stash houses or places where the drugs might be stored. Informant Heck had also failed in her efforts to introduce an undercover agent to the organization. Further, the informants were afraid of reprisals specifically because of Moore's earlier death threat to Informant Long if he found out that she was cooperating with law enforcement officials, and his later statement to Shapiro that, "it would only take $1," to have her erased. (Exhibit 1, ¶¶ 115, 118–121, T. 89–90).

Finally, on May 30, 1996, Informant Long successfully supplied Moore with a "chipped" cellphone, and on June 14, 1996, the case agents applied for and received a pen register on this cellphone. However, like the last pen register, this register was of limited use because it only identified telephone numbers being called by the cellphone, and did not provide the substance of those communications. (Exhibit 1, ¶¶ 89–93, T. 90–91).

*The Moore Wiretap Investigation*

By the end of June 1996, the case agents believed that they had attempted all of the "traditional methods of investigation" and that these methods had either failed completely, were of limited success or were too dangerous to try. The methods used included: (1) use of informants; (2) interviews with witnesses; (3) introduction of undercover agents; (4) search warrants; and (5) pen registers. The case agents, therefore, applied for a wiretap on Moore's chipped cellphone and his home telephone. On July 17, 1996, Agent Langley sought authorization to intercept wire communications to and from Moore's landline telephone number (303) 743–0479 (changed to (303) 671–5289), subscribed to by Jamel L. White, 18494 E. Kepner Place, Apartment 105, Aurora, Colorado (hereinafter the "Moore home telephone"), and Moore's cellular telephone number (303) 809–4970, ESN D4905B7E, subscribed to by CAR Communications, 8547 E. Arapahoe Road, # J, Box 194, Greenwood Village, Colorado (hereinafter "Moore's cellular telephone").

The target of this investigation was the Moore crack cocaine organization, including his suppliers and distributors. The named interceptees and targets were: "Larry Moore, Ronald Johnson, Ernest

L.C. Robison, Victor Handy, Wendy Dyakovich, Michael Crumpton, Elizabeth Martin, Patrick Miller, Donna Norris, and others as yet unknown." (Exhibit 1, ¶ 7(a), T. 12). The objectives of the wiretap were to gather admissible evidence leading to: (1) the identification of the individual(s) supplying Moore, Crumpton, and others in the organization with controlled substances (cocaine and cocaine base); (2) the identification of the person(s) distributing and transporting controlled substances (cocaine and cocaine base) on behalf of Moore, Crumpton and others in the organization; (3) the identification of the time(s) and location(s) of meetings during which Moore, Crumpton, and others in the organization distributed controlled substances (cocaine and cocaine base) for further distribution; (4) the identification of other communication facilities utilized by Moore, Crumpton, and others in the organization; and (5) the time(s) of importation and delivery of the controlled substances (cocaine and cocaine base) within Colorado and elsewhere. (Exhibit 1, ¶ 7(c)). The clear and express purpose of the wiretap was to gather information as it related to named interceptee and target Michael Crumpton. The case agents considered Crumpton and his suppliers and distributors to be part of the same investigation and organization as Moore. (T. 101).

The wiretap affidavit set forth the facts detailed above and included a conclusion section which summarized the necessity for the wiretap. In that section, Agent Langley concluded, based on all of the facts of the investigation to date, that necessity had been satisfied because: informants had failed to accomplish the objectives of the investigation; informants and

witnesses who had been interviewed had not been productive; attempting to introduce an undercover agent had failed; search warrants and pen registers had been of limited success; and a grand jury had not been tried because of the case agent's belief that it would be of limited success. (Exhibit 1, ¶¶ 114–129). On July 17, 1996, United States District Judge John L. Kane, Jr. authorized the wiretap on both the telephones used by Moore. The wiretap lasted for a thirty day period.

### 1. Information About Crumpton Obtained From the Moore Wiretap

During the first thirty days of the Moore wiretap, the case agents corroborated the belief that had been set forth in the Moore wiretap affidavit, to wit, that Crumpton was in fact a crack and cocaine source of supply for Moore. (T. 100). Also during the first thirty days of the Moore Wiretap, the case agents continued to try traditional methods of investigation to determine the identities of Crumpton's source, his associates and distributors, and where Crumpton was storing controlled substances. For example, the agents combined pen register data and trap and trace data to determine what cellular telephone Crumpton was using. The agents further conducted a subscriber check and determined that the cellphone was subscribed to by Noelle Poindexter, 18 Lansing Street, Aurora Colorado. (Government's Exhibit 2, ¶ 27).

Second, when the intercepted communications revealed that Crumpton and Moore were about to meet to transact a drug deal, the case agents conducted surveillance in connection with those meetings.[6] Through this wiretap directed surveillance,

---

**6.** During the first such surveillance, the agents were able to follow Crumpton to the intersection of Mississippi and Galena. At that point, Crumpton got into the left hand turn lane and conducted counter surveillance. (Exhibit 2, ¶¶ 21–23, 31–32, T. 104–106). During the second surveillance, on July 18, the agents followed Crumpton but had to pull off for fear of being detected. (Exhibit 2, ¶¶ 31–32, T. 108–109). On July 19, 1996, a

third surveillance was conducted on Crumpton but the surveillance agents lost contact with him. (Exhibit 2, ¶¶ 33–34, T. 109, 110). The fourth surveillance occurred on July 22, 1996, and the agents observed Crumpton's car parked in the parking lot of 1357 South Geneva Way. A motor vehicle check of the car revealed that it was registered in the name Crystal Ray.

the agents were able to establish what apartment Crumpton was using. The apartment was leased to Lateshia Harden. (Exhibit 2, ¶¶ 35–37, T. 110). The agents further attempted to determine whether there was a phone in the apartment and, if so, whether that phone was also subscribed to by someone other than Crumpton. (T. 107, 423).

The agents continued using traditional investigatory methods to determine what communications facilities Crumpton was using but this failed because the technology needed to trap and trace one cellular phone call to another was not available. (Exhibit 2, ¶ 27, T. 108). The pen registers had only been partially successful in that they confirmed communication between Crumpton and Harden (Exhibit 2, ¶¶ 44–46, T. 111, 112), and between Crumpton and Tyrone Gray. (Exhibit 2, ¶ 48, T. 112–113). The surveillances helped agents identify a potential stash house, but probable cause for a search warrant of that location was still lacking. (Exhibit 2, ¶ 51, T. 114–115). Most importantly, surveillance and the other traditional methods had not revealed who Crumpton's source of supply was.

At this point, what was revealed was Crumpton's extreme cautiousness and ability to conduct counter surveillance. (T. 106, 107, 109, 110–111). Indeed, the Moore wiretap confirmed that Crumpton had detected the earlier surveillance. Specifically, on July 26, 1996, Moore had a conversation with his daughter wherein Moore stated that Crumpton believed that people were following them and as a result, they were not going to do any deals. This conversation led the case agents to fear that continued surveillance might compromise the entire investigation. (Exhibit 2, ¶¶ 51–53). With respect to confidential informants, the case agents had not developed any new informants with information about the Crumpton organization. The only informant who had been able to get close to Crumpton was Informant Long, and she had been discontinued as an

informant because she resumed the use of crack cocaine. (Exhibit 2, ¶ 15, n. 1, T. 103–104).

### 2. Information Known About Crumpton Prior To The Crumpton Wiretap

After the agents determined that Crumpton was a source of supply for Moore, they examined the following historical information about Crumpton prior to applying for the Crumpton wiretap.

#### a. Information About Crumpton Preceding the Phoenix Investigation

The case agents became aware of the following information from a review of Aurora Police Records. On November 5, 1993, Crumpton was arrested following an aggravated robbery. Crumpton was shot and "jacked" by rival drug dealers and was found with crack cocaine in his pockets. (Defendant's Exhibit A). On February 26, 1994, Crumpton, Darian Hunter, Patrick Clemons and Cantrell Black were stopped by the Aurora Police Department. At the time of the stop, Crumpton was wearing body armor and carrying a Glock 9mm in his waistband. Cantrell Black was also armed and was later identified as Richard Stewart, a fugitive from Arizona. The four men were believed to have been part of the same drug crew. (Defendant's Exhibit A, T. 52–53)

#### b. The Phoenix Investigation

Prior to drafting the Crumpton Wiretap Affidavit, the case agents reviewed a MGTF Investigative Report (Defendant's Exhibit A), relating to a prior investigation of Crumpton. That investigation occurred between fall 1994 and spring 1995. FBI Special Agent Carle Schlaff, also assigned to the MGTF, was the case agent on that investigation. This earlier investigation began in September 1994 when Patrick Clemons debarked a flight from Phoenix to Baltimore, and was arrested by DEA officials while in possession of 15 kilograms of cocaine in his luggage. Clemons agreed to

cooperate and to make a monitored telephone call to his source in Phoenix. During the monitored call, Clemons and the source made references to "L.D." and "Love–Daddy," both aliases used by Crumpton. During the conversation, Clemons tipped off the source to the fact that the call was being monitored and thereafter, refused to cooperate further. (Defendant's Exhibit A, T. 52–53).

On November 2, 1994, a cooperating witness (referred to as "CS–X" during the course of the wiretap hearings) approached Agent Schlaff and provided information about the Baltimore cocaine seizure. CS–X advised that the source of the drugs was Crumpton and that Crumpton's main partners in Denver in the crack distribution business were Hunter and Gray. CS–X further stated that Clemons used to transport drugs for Crumpton. CS–X was reluctant to cooperate for two reasons. First, CS–X was a close associate of Crumpton, Hunter and Gray. Second, CS–X told Agent Schlaff that he feared reprisal from Crumpton and his crew and specifically noted that, because Crumpton had been "jacked" in 1993, Crumpton now wore body armor and carried a 9mm. Glock. CS–X was in a position to know Crumpton and his crew well and he "was in fear and didn't trust him with his life." (Defendant's Exhibit A, T. 55, 457, 517–518). On December 1, 1994, CS–X provided additional information to the Baltimore DEA agents regarding the arrest of Clemons and provided information about people who might be associated with Clemons, Crumpton and his crew. Included in this list were "Butter," "Dwight," "Dee" (an alias for Hunter), "Gooner Baby," "Shed," and "Wolf." CS–X could not, however identify the cocaine source in Phoenix. (Defendant's Exhibit A, Government's Exhibit 31).

In February 1995, Agent Schlaff approached Gray, advised him that he could be facing charges in federal court and asked for his cooperation regarding the Phoenix source. Gray refused to cooper-

ate directly against Crumpton first because of a family relationship, and second because Gray was aware of Crumpton's propensity for violence and was afraid for himself and his family. (Defendant's Exhibit A, T. 72–73, 459–460). Gray told Agent Schlaff that he did not know the Phoenix source and suggested that Hunter might be able to provide that information.

On March 18, 1995, Hunter met with Agent Schlaff. Like Gray, Hunter refused to provide direct information against Crumpton but agreed to provide information as it related to the source of supply in Phoenix. (Defendant's Exhibit A, T. 78–79, 463–464). Hunter advised that the source in Phoenix was "Dub," later identified as John Griffen. Hunter stated that Crumpton had purchased 10–15 kilograms of cocaine in the past but since Clemons' arrest, Dub was no longer dealing with the Denver crew. In April 1995, Hunter agreed to travel to Phoenix with Agent Schlaff in order to help the investigation. Prior to making the trip, Hunter received a "Use Immunity" Letter from Assistant United States Attorney Craig Wallace. The trip did not develop any new leads and Hunter returned to Denver. Hunter was not willing to provide any further information related to drug activities in Denver and, therefore, Hunter was discontinued as an FBI informant. (Defendant's Exhibit A, T. 79–80, 464–465).

In late May 1995, Agent Schlaff again met with Gray and told Gray that the Phoenix Investigation appeared to be at a dead end. Agent Schlaff asked whether Gray could provide information with respect to anyone else. Gray advised that he could engage in informant activities with respect to "John Last Name Unknown" (later identified as John Chavez, Jr.), who was a member of the "West Side Ballerz gang" from Commerce City. Gray further stated that "John Last Name Unknown" had sold kilogram quantities of cocaine to Tyrone Gray and other members of Gray's drug organization, including Crumpton. Gray stated that "John Last

Name Unknown's" pager number was (303) 392–9168, and that this was the number Gray and Crumpton used to contact "John" to set up drug transactions. On June 7, 1995, Gray identified John Chavez, Jr. as "John Last Name Unknown" and the person who had previously supplied Gray and Crumpton with multi-ounce to kilogram quantities of cocaine. Gray further identified a picture of Crumpton and stated that he had observed Crumpton purchase kilogram quantities of cocaine from Chavez on more than one occasion. During those transactions, Gray stated that both sides displayed semi-automatic pistols in order to keep control of the situation. (Government's Exhibit 32, ¶ 19(d), T. 75–76, 467–468).

Gray also told Agent Schlaff that his and Crumpton's relationships with Chavez, Jr. were on shaky ground and were not current. Nevertheless, Gray agreed to try and reestablish contact with Chavez, Jr., and agreed to attempt a controlled purchase of cocaine from Chavez, Jr. Gray did, in fact, talk to Chavez, Jr., on the telephone and attempted to set up a deal, however, none of the negotiations came to fruition. Agent Schlaff concluded from these failed deals that, as Gray had claimed, he and Crumpton were no longer "in" with Chavez. (T. 76, 468–472). In mid-June 1995, Agent Schlaff again contacted Gray and Gray indicated that he was considering "jacking" or robbing Chavez, Jr. After this, Agent Schlaff concluded that Gray could not be used proactively because of his dangerousness and discontinued using him as an informant. (T. 77, 471–473). At the time the Crumpton wiretap was initiated in August 1996, it had been over a year since Gray served as an informant.

In November 1995, Agent Schlaff concluded that the Denver Investigation was at a standstill and stopped his investigation, and in January 1996, Agent Schlaff learned that John Griffen, the source in Phoenix, had been arrested. (Defendant's Exhibit A, T. 80–81, 466).

### 3. *Communication Between Agents Schlaff and Langley Prior To The Crumpton Wiretap*

As previously discussed, in June 1996, Agent Langley and Officer Finnin, the case agents in the Moore investigation, learned that Crumpton might be one of Moore's sources of supply. At that point in time, Agent Langley talked to Agent Schlaff about his prior investigation. First, with respect to the connection between Chavez, Jr. and Crumpton, Agent Schlaff testified that he could not recall whether or not he spoke with Agent Langley directly on this topic. Agent Langley recalled having a conversation with Agent Schlaff about the connection between Crumpton and Chavez, Jr., and remembered that Agent Schlaff decided the relationship was over, particularly in light of the fact that Gray stated he was going to rob Chavez, Jr.

Prior to drafting the Crumpton Wiretap, Agent Langley reviewed the available toll records for Crumpton's cellular phone covering June 1 through 30, 1996 and July 26 through 30, 1996. (Defendant's Exhibit C, Bate Stamp No. 4570–4591, T. 207). Agent Langley saw no calls to any numbers previously associated with Chavez, Jr. Based upon Agent's Schlaff's information, coupled with the lack of calls on the toll records, Agent Langley had no reason to believe that Crumpton and Chavez, Jr. were still dealing together. (T. 142–143).

In June 1996, Agent Langley and Agent Schlaff also had a conversation about Hunter's connection to Crumpton. At that time, Agent Schlaff advised that, based on the information he had received from CS–X in December 1994, and his own association with Hunter in the spring of 1995, he believed that Hunter had been part of Crumpton's crew along with other individuals identified as "Wolf" and "Gooner Baby". Agent Schlaff claims that as of June 1996, he did not possess any current information regarding Hunter. (T. 474–475). Agent Schlaff did, however, agree to

set up a meeting between CS–X and Agent Langley and Officer Finnin. On June 27, 1996, CS–X met with Officer Finnin and Agent Langley and provided much the same information that he had provided in December 1994, relating to "Butter," "Gooner Baby," "Shed," and "Wolf." (Defendant's Exhibit B).

Despite the fact that Agent Schlaff's report of the meeting, written on July 1, 1996, identified those individuals as "being" in Crumpton's crew, Agent Schlaff specifically told Agent Langley and Officer Finnin that CS–X's information was historical, dating back to at least December 1994 and possibly a year earlier. Agent Schlaff was confident of this fact because as of June 1996, CS–X believed that Crumpton knew that CS–X was an informant. (T. 86). Therefore, CS–X, by his own choice, had not been associating with Hunter and Crumpton for a long period of time. (T. 116–118, 408–412, 432–433, 475–478, 479–480). On April 19, 1995, Defendant Hunter was given a "Use Immunity Letter" by the United State's Attorney's Office. (T. 465). Agent Schlaff never told Agent Langley, Officer Finnin or Deputy Volz that Hunter had been granted "use immunity," and therefore Agent Langley did not learn of the immunity until November 1998. (T. 185, 466).

### 4. Information Relating To Hunter Gained During the Moore Wiretap

On July 18, 1996, the Moore case agents intercepted a call which indicated that Moore and Crumpton were going to do a deal at a Denny's restaurant. They established surveillance and observed Crumpton arriving at the Denny's along with Hunter and another individual identified as Kendall Rhodes. The surveillance was videotaped and Agent Langley reviewed it a number of times. Hunter was seen walking briefly up to Moore's car window, speaking to him for less than 30 seconds and then walking away. Crumpton then got into the car with Moore and they drove away and returned a short time later.

From that surveillance, Agent Langley could not determine what role, if any, Hunter or Rhodes had in that transaction. (T. 116–120).

Prior to drafting the Crumpton Wiretap, Agent Langley again reviewed the available toll records for Crumpton's cellular phone which covered June 1 through 30, 1996 and July 26 through 30, 1996. Agent Langley did not see any calls to any numbers previously associated with Hunter. (T. 119–120).

### The Crumpton Wiretap Investigation

By early August, 1996, the case agents on the Moore investigation believed that they had established that Crumpton was a crack and cocaine source of supply for Moore. However, the case agents had not satisfied the objectives of the investigation in that they had not identified Crumpton's source of supply, his distributors (with the exception of Harden), or locations where Crumpton might be storing his drugs. (Government's Exhibit 2, ¶ 11(c)).

On August 14, 1996, Agent Langley applied for a wiretap on cellular telephone number (303) 807–2897, ESN H82F337EC, subscribed to by Noelle L. Poindexter, 18 Lansing Street, Aurora, Colorado 80010. The target of this investigation was the same as the target in the Moore Wiretap, i.e., the Moore/Crumpton drug distribution operation, their suppliers and distributors. The named interceptees were "Michael Andre Crumpton, a/k/a 'Lucky,' Larry Moore, a/k/a 'Captain,' Tyrone Gray, Lateshia Harden, and others as yet unknown." (Exhibit 2, ¶ 2(a)). The objectives of the Crumpton Wiretap were also the same as the Moore Wiretap. (Exhibit 2, ¶ 12(c), T. 101–102). For this reason, the Moore Wiretap Affidavit was specifically incorporated fully by reference and attached to the Crumpton Wiretap Affidavit. (Exhibit 2, ¶ 18, T. 104).

### 1. Necessity For the Crumpton Wiretap

In the Crumpton Wiretap Affidavit, Agent Langley summarized the facts

which had occurred during the Moore Wiretap and included a section summarizing the "necessity" for the Crumpton Wiretap. (Exhibit 2. ¶¶ 49–65). First, based on the earlier detailed facts, Agent Langley discussed the fact that surveillance had been tried and had nearly compromised the investigation. (Exhibit 2, ¶¶ 50–53). Second, Agent Langley stated his intent to obtain a clone pager which might assist in the investigation. (Exhibit 2, ¶ 54).

With respect to the use of confidential sources, Agent Langley stated that "none of the confidential sources in this investigation have been able to provide information regarding Crumpton's drug organization." (Exhibit 2, ¶ 56). In addition, the sources had not been able to purchase drugs from or introduce an undercover to Crumpton. Agent Langley explained that "the confidential sources in this case have knowledge of Moore's drug organization only." (Exhibit 2, ¶ 55). The confidential sources that Agent Langley was referring to consisted of "active informants" who could provide "current information" such as Long, Heck and Shapiro. (T. 441–442).

Agent Langley did not consider Hunter or Gray to be active informants. Hunter had stopped cooperating in April 1995 and was subsequently deactivated as an informant, and Gray stopped cooperating in June 1995 and was discontinued because of his dangerousness and failure to produce. (T. 77, 79–80, 441–43, 464–65, 471–73). Neither Hunter nor Gray had been in contact with the FBI or had provided any information within the prior year and a half. Agent Langley and Officer Finnin considered and discussed the option of re-approaching Hunter and Gray to see if they would cooperate, but for a number of reasons decided that this would not achieve their objectives and might compromise the investigation. First, Agent Langley was aware that Crumpton, Hunter and Gray had a family relationship and were very close. Second, even when Hunter and Gray were threatened with criminal

charges in 1995, they both specifically said they would not cooperate against Crumpton. Third, neither Hunter nor Gray had been productive informants and Gray had shown a proclivity toward violence. (T. 404–407). CS–X was also not considered to be an active source because his information was old and he was no longer in a position to deal with the Crumpton crew any longer. (T. 85–86). Agent Langley claims that he failed to discuss this information in detail in the Crumpton Wiretap Affidavit because he believed the information was old. Instead, he opted to summarize the prior MGTF/Phoenix investigation for Judge Kane. (Exhibit 2, ¶ 15, T. 441–442).

The affidavit further set forth that the case agents considered interviewing potential witnesses but rejected this technique because they believed the witnesses would fear retaliation. In support of this, Agent Langley set forth Crumpton's prior criminal history and his arrests for possession of guns. (Exhibit 2, ¶ 59, 128–129). Two potential witnesses, CS–X and Gray, stated that they were afraid of Crumpton and CS–X specifically made reference to Crumpton's criminal past. (Defendant's Exhibit A, T. 55, 72–73, 75–76, 457, 459–460, 467–468, 517–518). The Crumpton affidavit further outlined how toll records and trap and trace devices had been used and why Crumpton's secretive nature had rendered these methods unsuccessful. (Exhibit 2, ¶¶ 63–64).

*The Crumpton Renewal Wiretap*

On August 15, 1996, Judge Kane authorized the interception of wire communications occurring to and from cellular telephone number (303) 807–2897, ESN H82F337EC, subscribed to by Noelle L. Poindexter, 18 Lansing Street, Aurora, Colorado 80010. Due to installation errors by AT & T, the case agents did not begin actual interception of calls until 11 days into the 30 day authorization period. (Government's Exhibit 4, ¶¶ 41–43, T. 131). The 19 days that remained did not provide enough time to achieve the objectives of

the investigation. (T. 131–133). Therefore, on September 13, 1996, Agent Langley applied for a 30 day extension in which to continue monitoring Crumpton's cellphone. The target of the investigation and the objectives of the investigation had not changed. (Exhibit 4, ¶ 11(a)(c), T. 140). The named interceptees were "Michael Crumpton, Larry Moore, Tyrone Gray, Lateshia Harden, Michael Camack, Raspberry, Player, Poopsie and others unknown."

The additional names were added because, during the course of the 19 days of monitoring, the case agents had intercepted "Poopsie," "Player," "Raspberry," and Michael Camack having conversations with Crumpton relating to drugs. The case agents could not identify who Poopsie, Player or Raspberry were. Therefore, no investigative steps were taken toward them. (T. 141). With respect to Michael Camack, the case agents did do surveillance of a deal between Crumpton and Camack and had Camack stopped and fully identified. (Exhibit 4, ¶¶ 30–33, T. 148–149). Although the agents continued to do surveillance, no new leads were developed with the exception of the identification of Michael Camack. (T. 148).

On the issue of necessity, nothing had changed between the initiation of the Crumpton Wiretap and the application for the Crumpton Renewal Wiretap. There were no new informants, witnesses, locations to be searched or leads from surveillance. Therefore, the necessity section of the Crumpton Renewal Wiretap application generally repeated what was in the initial Crumpton Affidavit. (Exhibit 4, ¶¶ 40–57, T. 147–150).

### 1. *The Decision Not To Name Darian Hunter In The Renewal Wiretap*

Hunter was also not named in the Crumpton Renewal Wiretap application due to Agent Langley's belief that there still was not probable cause to believe that Hunter was engaged in criminal activity with Crumpton, and that Hunter would be intercepted over the target phone. However, it is true that prior to applying for the Crumpton Renewal Wiretap, Agent Langley did have pen register data which showed that there had been a phone call to Hunter's parent's home three months prior to the Crumpton renewal. (Defendant's Exhibit C, Bate Stamp No. 4603).

The first time that Hunter was intercepted over Crumpton's cellphone was on August 31, 1996. At this time, however, Hunter was not calling from his parent's home. Rather, he was speaking from a telephone number subscribed to by an "R. Collier" at 3327 S. Richfield Way, Aurora, CO. The agents later learned that this was the telephone of Hunter's girlfriend, Shaynelle Collier. (T. 120). During this conversation, Hunter and Crumpton talked about how many "computers" might be in an apartment. This conversation was later tied to a September 19, 1996, plan to break into an apartment and steal a number of kilograms of cocaine belonging to Chavez, Jr.

On September 19, 1996, communications intercepted from Crumpton's cellular telephone revealed that Crumpton and Hunter were conducting a surveillance on a location unknown to the Title III monitors. Later intercepted communications demonstrated that Crumpton and Hunter were planning a robbery in an apartment complex. At approximately 7:22 p.m., Crumpton made a call to (303) 807–4907, and spoke to an unidentified male about an impending drug transaction. During the course of the evening, numerous other calls were intercepted between Crumpton and Hunter. At approximately 10:33 p.m., a conversation occurred during which monitoring agents/officer learned that Hunter and Crumpton were arranging for the purchase of at least a kilogram of cocaine from an individual they referred to as "John." However, it was quite apparent that what Hunter and Crumpton were really planning to do was to rob "John" and steal his cocaine and money.

The case agents then asked Agent Schlaff to run an emergency subscriber check to determine who Crumpton was speaking with. When Agent Schlaff learned that the phone was in the name Tracy Chavez, he made the connection that Crumpton was dealing with Chavez, Jr. At approximately 9:55 p.m., Crumpton spoke with Chavez, Jr. on telephone number (303) 412–9355. During the conversation Crumpton told Chavez that he had an automobile accident on the way to their meeting. Chavez, Jr. offered to send "Jaime" over to the accident to help out. Crumpton stated that he could not remember who "Jaime" was and Chavez replied "remember the last deal, it was at his (Jaime's) apartment." Crumpton again spoke with Chavez, Jr. at approximately 10:24 p.m. who stated that he "had the stuff," and instructed Crumpton to go to a nearby convenience store and call him back. After it became apparent that Crumpton and Hunter intended to go through with their plan to rob Chavez, Jr. the supervising agents of the Title III made the decision to intervene and stop the robbery.

Marked uniform officers stopped Crumpton and seized a locked gym bag from the trunk of the vehicle he was driving. A search warrant was later obtained for the gym bag, and the search uncovered evidence of the planned cocaine robbery including: a loaded 9mm handgun with an extra loaded magazine, two ski masks, body armor and a lock picking kit. Hunter was also identified on that night. (T. 143–146).

### Post–Wiretap Inventory and Notice To Interceptees

The Moore wiretap expired on August 7, 1996. The tapes from this wiretap were sealed by Judge Kane on August 8, 1996. At the time the tapes were sealed, Judge Kane ordered that the notification/inventory provision of Title 18, U.S.C. § 2518(8)(d), be postponed as to all parties intercepted during the electronic surveillance until further order of the Court. (Government's Exhibit 7). The Crumpton Renewal Wiretap expired on October 11, 1996, and the tapes were sealed on October 16, 1996. Like the Moore wiretap, at the time the tapes were sealed, Judge Kane ordered that the notification/inventory provision of Title 18, U.S.C. § 2518(8)(d), be postponed as to all parties intercepted during the electronic surveillance until further order of the Court. (Government's Exhibit 8). Although the Orders signed by Judge Kane on August 8, 1996, and October 16, 1996, effectively delayed the notification requirement indefinitely, on January 24, 1997, the government applied for, and Judge Kane ordered that any service of wiretap notification and inventory be delayed for an additional period of 90 days, or until April 21, 1997. (Government's Exhibits 9, 10, 11, 12). Another 90 day delay was ordered on April 22, 1997. (Government's Exhibits 13, 14, 15, 16).

In preparation for service of notice and inventory, the case agents, Agent Langley and Officer Finnin, prepared a list, based on pen register information, of all telephones called during the course of the wiretap investigation. From this list, the agents determined whether a person(s) had actually been intercepted in connection with the identified telephone. In cases where a specific person could be identified as having been intercepted, the case agents requested that a notification letter be prepared for that individual. Darian Hunters' name was on this list. (Government's Exhibit 17, T. 157–161).

In June 1997, Ms. Ann Perez, secretary to the Government's counsel, prepared notification/inventory letters for all individuals identified by the case agents. On May 13, 1997, the Government filed with Judge Kane a list of the wiretap interceptees who the Government intended to notify, along with a prepared form of order. Again, Darian Hunters' name was on this list, however, the prepared forms of order where never signed.

On or about June 9, 1997, Ms. Perez contacted Agent Langley and indicated to him that the interceptee letters were completed, to which Agent Langley responded that he and Officer Finnin wanted to hand deliver inventory notices to a select number of individuals that they deemed as important to the case and asked that these letters be removed from her pile. Ms. Perez removed these letters, made copies, and gave the originals to Agent Langley. On June 9, 1997, Ms. Perez then sent the remaining letters via certified mail, return receipt requested. All these letters were signed by Ms. Perez on behalf of the Government's counsel. (T. 165–167).

Thereafter, Agent Langley and Officer Finnin attempted to hand deliver some of the inventory notices. However, this task proved to be difficult and time consuming, and Agent Langley opted to send the letters via regular mail instead. (T. 173–176). Agent Langley claims that he mailed the inventory notice prepared by Ms. Perez to Hunter, and the letter was never returned as undeliverable. (T. 174). The address used by the case agents was believed to be Hunter's parents' residence and during each of his arrests since February 1990, Hunter provided the address used by the case agents as his home address. (T. 173–175).

Agent Langley claims that he mailed the interceptee letters a few days before October 24, 1997. However, the Government admits that Agent Langley did not mail the notification letters by July 18, 1997— the final date of the extension granted by Judge Kane in the second extension order. This was allegedly due to Agent Langley's mistaken belief that a third delay notification order had been applied for and granted and that he had until mid-October to send the letters. (T. 175–176)

## LEGAL ANALYSIS & CONCLUSIONS OF LAW

### Wiretap Standard of Review

■■■ A wiretap authorization order is presumed proper, and the defendants bear the burden of overcoming that presumption. *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir.1997), *citing United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir.), *cert. denied*, 493 U.S. 981, 110 S.Ct. 513, 107 L.Ed.2d 515 (1989). The defendants must come forward with a *prima facie* showing that the wiretap was conducted pursuant to an illegal order. *United States v. Bennett*, 825 F.Supp. 1512, 1518 (D.Colo.1993). Not every failure to comply with the requirements in the wiretap statute renders the interception of wire or oral communications unlawful. *United States v. Chavez*, 416 U.S. 562, 575, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). The defendants must not only demonstrate a deviation from the requirements of the statute, but this deviation must be substantial. *Id.* Defendants Crumpton, Harden, and Camack have failed to make such a showing.

Federal law permits wiretapping and tracing where certain findings and conditions are met. *See generally* 18 U.S.C. §§ 2510–2522 (1998). All applications for a wiretap must contain the following elements: (a) the identity of the law enforcement officials making and authorizing the application; (b) a full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued; (c) a full and complete statement as to whether other investigative procedures have been tried and failed, or why they seem unlikely to succeed if tried; (d) a statement of the period of time for which the interception is required to be maintained; and (e) a full and complete statement of the facts concerning all previous applications involving any of the same persons, facilities or places specified in the application. 18 U.S.C. § 2518(1). The defendants in this case have all challenged the admissibility of evidence obtained by the government through the use of wiretaps authorized by Judge Kane. Specifically, the defendants each argue that the information provided

by the government in its wiretap applications did not conform to the requirements of the wiretap statute. I will address each of these arguments.

#### Defendants Michael Crumpton, Lateshia Harden and Devon Camack

Defendant Crumpton challenges the lawfulness of the Moore and Crumpton Wiretaps on the grounds that: (1) the government has failed to demonstrate "necessity;" (2) the government failed to properly "minimize;" (3) the wiretap orders signed by Judge Kane were facially insufficient; and (4) the government failed to name all of the intended interceptees in the wiretap applications. Defendants Harden and Camack have adopted Defendant Crumpton's arguments on this issue. The government represents that the "necessity" and "minimization" requirements were met, that Judge Kane's Orders were facially sufficient, and that the fact that all of the interceptees were not named in the application is not dispositive of the issue.

1. *The "Necessity" Requirement of Title 18, U.S.C. § 2518(1)(c)*

As set forth in Title 18 U.S.C. § 2518, each and every affidavit for wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and have failed or why they reasonably appear to be unlikely to succeed if tried or appear to be too dangerous." *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir.1995). The purpose of the "necessity" requirement is to "ensure that the relatively intrusive device of wiretapping 'is not resorted to in situations where traditional investigative techniques would work.'" *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir.1995), *cert. denied*, 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996) (quoting *United States v. Kahn*, 415 U.S. 143, 153, n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974)). Thus, before issuing a wiretap order, the reviewing judge must independently determine that the wiretap is necessary, i.e., that "normal investiga-

tive procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous." 18 U.S.C. § 2518(3)(c).

The Tenth Circuit, in *United States v. Castillo–Garcia*, 117 F.3d 1179, 1187 (10th Cir.1997), specifically addressed the issue of what the government must demonstrate with respect to the necessity requirements of Title 18 U.S.C. § 2518. First, with respect to the standard of review, the Court noted that the application of the necessity requirement is a "question of law" subject to *de novo* review, and therefore the judge reviewing the wiretap affidavit in a suppression motion does not owe deference to the findings of the judge that issued the wiretap. *Id.* at 1186. The Tenth Circuit then established four categories of "normal investigative procedures" that the government must address in its application. The Court held that the government must explain, with particularity: (a) whether these investigative techniques have been tried against the target of the wiretap; (b) if not, why law enforcement agents have failed to try these "normal" investigative techniques; or (c) set forth how "normal" tools were tried but failed to expose the crime or would be too dangerous to employ. *Id.* The four categories of "normal" techniques include: "(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants." *Id.* at 1187.

As a further requirement, the Court stated that the government should also attempt the use of pen registers and/or trap and trace devices prior to resorting to a wiretap. *Id.* Therefore, the affidavit should state whether these methods have been tried, and if not, why these less intrusive methods would be unsuccessful or too dangerous to employ. *Id.* The Tenth Circuit, however, specifically held

that the "necessity" requirement of Title III was not an "exhaustion" requirement, and that "the government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping." *Id.* at 1188.

■■■ Moreover, where the government's stated explanation for its decision regarding normal investigative techniques clearly encompasses each of these categories, it is not necessary for the government to formally address each category with an explanation. *Id.* Therefore, "the government's failure to explain its failure to utilize one or more specified categories of normal investigative techniques [is] not fatal to the wiretap application if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." *Id.*

### a. *"Necessity" and the Moore Wiretap Affidavit 96–WT–4*

■■■ As set forth in *Castillo Garcia,* the government's showing of necessity must be tested in a practical and common sense fashion, taking into consideration all the facts and circumstances of a particular case. *Id.* at 1188. An analysis of the government's statement of necessity in the Moore wiretap affidavit, coupled with Agent Langley's testimony at the wiretap hearing, shows that the government did, in fact, meet the *Castillo Garcia* requirements for demonstrating necessity.

#### (i) *Use of Surveillance*

First, with respect to the "normal technique" of standard visual and aural surveillance, the record is clear that the agents did extensive surveillance prior to initiating the Moore Wiretap. Surveillance was done in connection with all of the controlled purchases of crack cocaine involving Robison, Handy, and Moore. Surveillance was also conducted on Robison during and subsequent to his return from California with a suitcase full of crack cocaine.

Surveillance had been partially successful in that it led to the identification of Crumpton as a potential source for Moore, and to the identification of Harden as a potential distributor for Crumpton. However, surveillance had not led to the identification of Crumpton's sources or distributors, the location of stash houses, or information about how drugs were being transported to Colorado. As a result, Agent Langley concluded that surveillance would not accomplish the goals of the investigation. In support of this statement, Agent Langley specifically noted in the Affidavit that Moore was surveillance conscious. He based this conclusion upon the fact that Moore conducted all controlled purchases in public places, utilized vehicles registered to other individuals, and employed the services of other individuals to conduct drug transactions for him. From this, Agent Langley concluded that additional surveillance was unlikely to establish the roles of the named co-conspirators, identify additional co-conspirators, or otherwise provide admissible evidence in the case.

#### (ii) *Use of Informants and Cooperating Defendants*

The record and the Moore Affidavit also clearly establish that informants had been used with only limited success. First, Agent Langley testified that all of the available informants—Long, Heck, and Shapiro—were crack cocaine users who were at the bottom of the organization and not in a position to deal directly with, or gain any information about, the source of supply. Second, the affidavit noted that Moore was secretive and protective of his cocaine source(s) of supply. Therefore, even though Informant Long had been able to identify one of Moore's sources of supply as "Lucky," and the agents were able to determine that "Lucky" was Crumpton, the information obtained was not sufficient to indict Crumpton or lead

the investigators to his stash houses. Additionally, Agent Langley stated that Moore was believed to have other sources of crack cocaine which had not been identified and that none of the informants were able to purchase drugs directly from Moore's source(s) of supply. Finally, the affidavit explained that the confidential sources were of limited value because they were afraid to testify. Specifically, Agent Langley noted that during a controlled drug purchase by Informant Long on February 13, 1996, Moore threatened to kill her if he found out that she was working for the police. Moore also told Shapiro that if she turned on him, it "would only take $1 to have [her] erased." In light of these facts, Agent Langley concluded that even if the confidential sources were willing to testify, for trial purposes they had only limited knowledge of the entire organization and alleged conspiracy.

The affidavit also sets forth that the case agents approached Hatcher and interviewed her about her dealings with Moore. However, Hatcher was a crack cocaine addict and had a close relationship with Robison and Moore. Thus, the case agents believed that using her as a street informant would be both unproductive and potentially damaging to the investigation. The agents' attempt to introduce an undercover officer to the organization failed due to Robison's refusal to deal. This led to Agent Langley's conclusion that the secretiveness of the organization precluded the use of undercover agents who could infiltrate and identify all members of the conspiracy or otherwise satisfy all the goals of this investigation and would put the undercover agents' lives at great risk. This was particularly true in light of the threats made to Informants Long and Shapiro.

### (iii) *Interrogation of Witnesses and the Grand Jury*

To further establish necessity in the Moore Affidavit, Agent Langley stated that witness interviews had been attempted without success. Hatcher, Sandoval and Everidge had been interviewed but could not provide information sufficient to achieve the goals of the investigation. Agent Langley explained that the majority of the witnesses had only limited information about Moore's alleged drug organization. Moreover, Agent Langley reasoned that interviews with persons involved in the distribution of controlled substances who might be prospective witnesses were not normally productive inasmuch as the prospective witnesses feared reprisals and were reluctant to discuss such matters with investigators. The agents' prior experiences with witnesses in the Moore investigation supported this assertion. Further, Agent Langley concluded that these witnesses might be reluctant due to their own culpability. The affidavit also contained a discussion of the fact that a federal grand jury investigation had not been initiated due to fear of alerting the other co-conspirators, the infeasibility of granting immunity at an early stage in the investigation, and the unlikelihood that a grand jury would lead to evidence of the co-conspirators.

### (iv) *Use of Search Warrants*

The record demonstrates that the case agents did attempt to use search warrants, specifically with respect to the bag carried by Robison during the airport stop. While the execution of the search warrant demonstrated the quantity of crack the organization was obtaining, it did not provide information regarding the origins and ultimate destination of the drugs. The affidavit addressed the use of search warrants and noted that in this case, Moore and the other members of the alleged organization had insulated their source(s) of supply in such a way that it was unlikely that a person would be able to position themselves to effectively gather information upon which probable cause for a search warrant on the source(s) of supply's residences or stash houses could be developed. Agent Langley admitted that some of the information provided by the confidential sources in this case was of the nature that could, if forthcoming in a timely manner

and if corroborated, form probable cause and that acting on that information might have resulted in drug-related charges based on search warrant recoveries. Yet, even if drugs or drug records were recovered through a search pursuant to a warrant, Agent Langley concluded that such seizures might have limited value against persons not present at the time of the search. Additionally, it was unlikely that a search warrant alone would result in a complete determination of the scope of the drug dealing activity of all the conspirators.

### (v) Toll Records and Pen Register Information

The Moore Affidavit contained a detailed discussion of how pen register and toll record information had been gathered and analyzed, and stated that both investigative methods had been exhausted. Agent Langley noted that the pen register, caller identification, and toll record information only provided, at best, the names and addresses of the subscribers to the callers or callees and could not explain the subscribers' relationship to the drug enterprise or their specific involvement in the criminal organization.

### b. "Necessity" and the Crumpton Wiretap Affidavit 96–WT–6 and the Crumpton Renewal Affidavit

As the Court of Appeals noted in *Castillo Garcia*, "even within an ongoing investigation of a suspected drug conspiracy, the government may not simply move swiftly from wiretap to wiretap." *Castillo–Garcia*, 117 F.3d at 1196 (quoting *United States v. Castillo–Garcia*, 920 F.Supp. 1537, 1552 (D.Colo.1996)). Rather, under Title III, "the government must always pause to consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap." *Id.* at 1196. As this Court recognized in *United States v. John Chavez, Sr., et. al.*, No. 97–CR 197–D (D.Colo. May 13, 1998), under *United States v. Killingsworth*, 117 F.3d 1159 (10th Cir.1997) and

*United States v. Barrios*, 994 F.Supp. 1257 (D.Col.1998), the target of a wiretap may be a drug organization as a whole, rather than an individual.

In *Castillo Garcia*, the government engaged in successive wiretaps which "spun-off" from a known target, to a newly discovered target, to another newly discovered target. The present case, like *Chavez* and *Barrios*, involves a drug trafficking organization that was the target of the wiretap. In fact, Crumpton was named as a target in the Moore Wiretap and the government already knew that Crumpton and Moore were part of the same criminal drug distribution organization at the time the Moore Wiretap was issued. Because the focus of the Moore Wiretap was to identify and gain evidence about the Moore organization as a whole, a significant portion of the Moore affidavit detailed the investigation into Crumpton and his role as drug supplier to Moore. As a result, the necessity section of the Moore affidavit dealt not only with necessity as applied to the Moore telephone, but how traditional methods and tools of investigation had been tried against the drug organization as a whole and specifically Crumpton. It was for this reason that the Moore affidavit was attached to the Crumpton affidavit and incorporated by reference. In considering the Moore affidavit in connection with the Crumpton affidavit, it is clear that the Crumpton affidavit shows that necessity was demonstrated for the wiretap:

### (i) Use of Surveillance

In his affidavit, Agent Langley stated that physical surveillance had been utilized and resulted in the identification of a potential Crumpton stash house, but he concluded that Crumpton was highly surveillance conscious, which would make additional surveillance likely to compromise the investigation. As specific support for this conclusion, Agent Langley noted that on July 26, 1996, Moore received a telephone call from his daughter, Tanisha. In

this conversation, Moore told Tanisha that "L" (believed to be Crumpton) "said he thinks somebody's been following us so we ain't doing nothing ... for a couple of days." Agent Langley interpreted this to mean that Crumpton believed he had seen law enforcement surveillance observe his meetings with Moore. As a result, Crumpton stopped selling crack cocaine to Moore for a couple of days. Agent Langley further concluded that continued physical surveillance was unlikely to succeed in establishing conclusively the roles of unnamed coconspirators, or provide admissible evidence with regard to this investigation.

#### (ii) Use of Informants and Cooperating Defendants

With respect to the use of informants, Agent Langley again set out that none of the confidential sources had been able to obtain information regarding Crumpton's cocaine supplier. Additionally, no confidential source had been able to purchase crack cocaine directly from Crumpton or introduce an undercover agent to Crumpton to purchase crack cocaine. Finally, the confidential sources in this case had limited knowledge of Moore's drug organization, and were not in a position to provide information regarding Crumpton's operations. The affidavit highlights the fact that Moore was so protective of his crack cocaine supplier that it was unlikely that the confidential sources would ever be able to purchase drugs directly from the source of supply. Additionally, the information that the sources could provide was limited by their very narrow scope of knowledge about the organization.

The defendants argue that suppression should be granted because the government could have used Gray and Hunter as confidential informants. The Court disagrees. Agent Langley did not consider Hunter and Gray to be active informants because Hunter was deactivated in April 1995, 16 months prior to drafting the Crumpton Wiretap, and Gray stopped cooperating in June 1995 and was deactivated because of

his dangerousness and failure to produce. Neither Hunter nor Gray had been in contact with the FBI or had provided any information within the prior year and a half.

Agent Langley and Officer Finnin considered and discussed the option of reapproaching Hunter and Gray to see if they would cooperate against Crumpton but decided that would not achieve their objectives and might compromise the investigation. First, Agent Langley was aware that Crumpton, Hunter and Gray had a family relationship and were very close. Second, even when Hunter and Gray were threatened with criminal charges in 1995, they both specifically said they would not cooperate against Crumpton. Third, neither Hunter or Gray had been productive informants and Gray had shown a proclivity toward violence. CS–X was also not considered to be an active source because his information was old and he/she was no longer in a position to deal with the Crumpton crew. It is true that Agent Langley did not put this information into the Crumpton affidavit. However, as this Court noted in *United States v. John Chavez, Sr., et, al:*

> "the government need not exhaust or explain its failure to exhaust every conceivable procedure before resorting to wiretapping. Thus, the government's failure to explicitly explain its failure to utilize one of the categories of normal investigative technique will not be fatal to the wiretap application if it is clear that requiring the government to attempt the unexhausted or unexplained technique would be unreasonable. *Castillo Garcia* does not allow a defendant to second guess a narcotics investigation by arguing that because certain steps that could have been taken were not, the government's wiretap is unconstitutional."

*United States v. John Chavez, Sr., et al.,* No. 97–CR–197–D (D.Colo. May 13, 1998). It is evident from the record that requiring the case agents to re-contact Gray and

Hunter at this point would have been unreasonable, potentially unsuccessful, and could have compromised the investigation.

### (iii) *Witness Interviews and the Grand Jury*

In language which mirrors the Moore affidavit, Agent Langley again set out that further interviews in this case were not likely to provide enough information to fully disclose the scope of Crumpton's criminal enterprise. At the time the affidavit was submitted, the majority of witnesses with information about Crumpton's criminal enterprise had only purchased crack from Moore and had no knowledge of Crumpton's source of supply or how his drug distribution organization operated. Agent Langley further reasoned that interviews with persons involved in the distribution of controlled substances who might be prospective witnesses would not likely be productive. The witnesses who knew Crumpton would fear him due to his extensive criminal history including four arrests for carrying a concealed weapon and two arrests for assault.

### (iv) *Search Warrants and Pen Registers*

The search warrant section and the pen register sections mirror what was contained in the Moore affidavit. As the Court recognized in *Chavez* and *Barrios,* the use of identical language is inevitable in a case involving extensive, long-term investigations which utilize multiple wiretaps that target the same group of individuals. With respect to the renewal affidavit, little had changed in the investigation and therefore the necessity section mirrors what was contained in the earlier affidavits. However, this does not make the affidavit "boiler plate." It is not "boilerplate" to reiterate factual events which are part of the history of an investigation. After all, historical fact, if reported accurately the first time, does not change merely because it is being repeated in several different formats. *See United States v. Parks,* 1997 WL 136761 (N.D.Ill. March 24, 1997) (stating that, "[a]lthough

an extension affidavit must demonstrate the necessity of ongoing surveillance, it need not set forth different information from that which is presented in the original application. Duplication may be unavoidable, in fact, where the basis for necessity remains unchanged over the course of an authorization period.")

As with the *Chavez* wiretap, nothing had changed between the time the Moore wiretap was initiated and the time the Crumpton Wiretap began. The investigation had been conducted for a period of two years, surveillance had been tried and failed, and the informants with some access to the organization could not successfully infiltrate or provide a complete picture of the criminal structure. Potential for co-conspirator cooperation was not available nor was the grand jury a feasible possibility. Witnesses were still afraid to come forward out of fear of reprisal. In other words, there had been no significant breakthroughs or change of events between the Moore Wiretap and the Crumpton Wiretap and Renewal.

In the case of an ongoing investigation into an identified organization, the *Castillo Garcia* opinion does not hold that investigating officers must retry all the normal techniques that have already failed simply because there was an intervening wiretap. Indeed, such a requirement might result in a colossal waste of investigative resources. All *Castillo Garcia* requires is that the government look at the information gained as a result of the wiretap and determine whether any new leads have been developed. If a wiretap identifies a potential target who has never been the subject of any investigation, than the government must attempt normal techniques as to that newly identified conspirator before resorting to a "spin-off" wiretap on the new target. Yet, this rule does not apply to previously existing targets who were already subject to traditional law enforcement investigation.

The record shows that during the course of all the wiretaps in this case, the agents

continued to employ normal investigative techniques, conduct surveillance, talk to witnesses, and review pen register data. For all of the above stated reasons, the Court finds that the Moore Wiretap, Crumpton Wiretap, and Crumpton Renewal Wiretap applications all satisfied the "necessity" requirement set forth in *Castillo Garcia*, and the government did effectively demonstrate a need for the wiretaps.

### c. "Minimization" and the Moore and Crumpton Wiretaps

"Minimization requires that, '[e]very order or extension thereof shall contain a provision that the authorization to intercept shall be . . . conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter. . . .'" 18 U.S.C. § 2518(5). Determination of proper minimization is analyzed under a reasonableness standard and depends on the circumstances of the wiretap. *United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir.1994). Where the investigation involves a widespread conspiracy, broader surveillance may be justified. *Id.*

■■■ The Tenth Circuit has adopted a formulaic method of determining "reasonableness" as articulated in *United States v. Willis*, 890 F.2d 1099 (10th Cir.1989). The initial burden is on the government to show proper minimization, however, once the government has made a *prima facie* showing of reasonable minimization, the burden shifts to the defendant to demonstrate that more effective minimization could have taken place. *Id.* at 1102; *United States v. Torres*, 908 F.2d 1417 (9th Cir.1990).

■■■ The Defendants' argument regarding minimization is that the Government, "blanket[ly] monitor[ed] . . . and recorded everything that [they] said." There are no other specific allegations made regarding this issue. The Government, however, has shown that the Crumpton wiretaps and Moore home telephone wiretaps had a minimization rate of ninety-two (92) percent, and the Moore cell phone wiretaps had a minimization rate of sixty-seven (67) percent. In *United States v. Willis*, the Tenth Circuit Court of Appeals found that, under the facts of that case, a seventy-eight (78) percent minimization effort was very reasonable. *United States v. Willis*, 890 F.2d 1099 (10th Cir.1989). Here, given the secret and conspiratorial nature of this case, the federal agents needed as much time as possible to determine the substance of each call, and the Court therefore finds that the sixty-seven (67) to ninety-two (92) percent minimization rate attained by the agents was reasonable under the circumstances. Further, none of the Defendants has specifically articulated any ways in which the Government could have increased the minimization rate. For these reasons, I reject the Defendants' argument that the agents failed to adequately minimize the wiretap communications.

### d. "Facial Sufficiency" and the Moore and Crumpton Wiretaps

In order to be facially sufficient, a wiretap order must contain the following: (1) the identity of the interceptee, if known; (2) the nature and location of the communications facilities to which the authority to intercept is granted; (3) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates; (4) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and (5) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall be automatically terminated when the described communication is first obtained. 18 U.S.C. § 2518(4). Further, the Order must articulate the necessary findings under 18 U.S.C. § 2518(3).

I find that Judge Kane's wiretaps orders are facially sufficient. The Orders state the reasons for probable cause, note that normal investigative procedures were inad-

equate, name all of the interceptees then known to the Court, specify the communications facilities to be used for interception, and set out and track all of the other information required under the wiretap statutes. This satisfies the facial sufficiency requirement. *See United States v. Sorapuru*, 902 F.Supp. 1322, 1326 (D.Colo. 1995) (finding a wiretap order which reflected the precise statutory language of 18 U.S.C. § 2518 to be facially sufficient).

### Defendant Darian Hunter's Motion to Suppress Wiretaps

Defendant Hunter challenges the validity of the Crumpton Wiretaps based on three arguments: (1) that necessity was not established; (2) that he was not identified in the wiretap affidavits; and (3) that he was not appropriately noticed about the wiretaps as required under the federal rules. The Court rejects the Defendant's first argument for the reasons articulated in the earlier discussion regarding the "necessity" requirement, and incorporates that discussion herein. Yet, the Court finds some merit to the Defendant's second and third arguments, and believes those issues require closer examination.

 Under 18 U.S.C. § 2518(4), when applying for a wiretap, the Government is required to provide the identity of all persons, if known, whose communications will be intercepted. The Supreme Court has interpreted this to require the government to identify an individual in a wire-tap authorization application only where there is probable cause to believe that the individual is engaged in the criminal activity under investigation, and that the individual's communications will be intercepted over the target telephone. *United States v. Donovan*, 429 U.S. 413, 423, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Yet for the purposes of considering a motion to suppress, the Court also held that a failure to identify an interceptee can not invalidate an otherwise lawful judicial wiretap authorization. *Id.* at 435, 97 S.Ct. 658. A lawful authorization is one based on the " 'full and complete statement' of

relevant facts supplied by law enforcement authorities." *Id.* Essentially then, in order to suppress evidence based upon the omission of a potential interceptee's name, this Court must find that the presence of that information would have precluded judicial authorization of the intercept. *Id.* at 436, 97 S.Ct. 658.

 Defendant Hunter concedes that, by itself, a failure to name an interceptee is not cause for suppression of information obtained through a judicially authorized wiretap. However, he contends that Judge Kane did not receive a full and complete statement of relevant facts regarding his contacts with Michael Crumpton. In light of the law, to justify suppression, Defendant Hunter must demonstrate that the presence of information in the wiretap application regarding his contacts with Michael Crumpton would have materially affected Judge Kane's decision to authorize the wiretap. The Court finds that this burden has not been met.

The evidence presented during the hearing demonstrates that the application failed to mention Hunter's contacts with federal agents and his "use immunity" grant from a United State's Attorney. In evaluating the surrounding facts, however, I do not conclude that Judge Kane's decision would have been materially affected by the inclusion of such information. Agent Langley testified that the information Hunter provided proved unhelpful in achieving the overarching goal of the Moore/Crumpton investigation—discovering a major source of crack/cocaine supply in the Denver area. This occurred due to Hunter's unwillingness to provide any information that would directly implicate Crumpton or provide insight about his alleged drug activities in Denver, and the unfruitfulness of a trip to Phoenix with Hunter which was supposed to reveal a source of supply located in that state. Notably, it was these two factors which lead to the deactivation of Hunter as a confidential informant over a year before the

wiretap was authorized. These facts were not so material that doubts would have been raised as to whether the "necessity" element, or any other substantive element of the wiretap application, was satisfied. Even with knowledge of these facts, I find that the government believed in good faith that a wiretap was the only method available to achieve the goals of the investigation. For this reason, I reject Defendant Hunter's second argument in favor of suppression.[7]

██ Finally, through his third argument, Defendant Hunter claims that the fruits of the wiretap should be suppressed because the government failed to properly serve inventory notice as required by 18, U.S.C. § 2518(8)(D). The government admits that Agent Langley served the inventory 90 days late. The question presented then is whether a single, technical, violation of the wiretap statute should result in suppression of the evidence against the defendant. The Court does not believe that the law requires such a result.

As set forth in *United States v. Donovan*, 429 U.S. 413, 428, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), the Title III Statute provisions which regulate notice and inventory do not play a central role in the wiretap statutory scheme. Therefore, violations of this provision do not rise to the level of a "constitutional violation" and do not warrant suppression absent a clear showing of prejudice to the defendant. *Id.* This question was specifically addressed by the Tenth Circuit in *United States v. Savaiano*, 843 F.2d 1280 (10th Cir.1988). In that opinion, the Court held that "the filing of the inventory within a 90 day time limit ... is a ministerial act and failure of strict compliance does not require suppression except upon an affirmative showing of prejudice." *Savaiano*, 843 F.2d at 1291, *citing United States v. Smith*, 463 F.2d 710 (10th Cir.1972). The Tenth Circuit

reaffirmed that suppression should only be granted when evidence was obtained as a result of an illegal wiretap from the onset. *United States v. Cardall*, 773 F.2d 1128, 1134 (10th Cir.1985).

The Supreme Court has further stated that although the requirements of Title III should be strictly observed, not every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications unlawful. *United States v. Chavez*, 416 U.S. at 574–75, 94 S.Ct. 1849. The defendants must demonstrate a substantial deviation from the statutory requirements of Title III. *United States v. Bennett*, 825 F.Supp. at 1518. The drastic remedy of suppression is not required where a technical violation occurs and the general purpose of the statute has been preserved. *United States v. Lawson*, 545 F.2d 557, 562 (7th Cir.1975), *cert. denied*, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976). In addition, some courts have held that a showing of governmental "bad faith" is required in order to justify suppression. *United States v. Baker*, 589 F.2d 1008, 1011 (9th Cir.1979); *United States v. Rotchford*, 575 F.2d 166, 173 (8th Cir. 1978); *United States v. de la Fuente*, 548 F.2d 528, 538 (5th Cir.1977), *cert. denied*, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977); *United States v. Doolittle*, 507 F.2d 1368, 1371 (5th Cir.1975), *cert. denied*, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 580 (1977); *United States v. Cantu*, 625 F.Supp. 656 (N.D.Fla.1985), *aff'd* 791 F.2d 940 (11th Cir.1986); *see also United States v. Bennett*, 825 F.Supp. at 1523.

The record in this case shows that although the government was not as careful as it should have been in its efforts to serve notice on Defendant Hunter, there is no evidence of bad faith. Agent Langley put Hunter's name on the notice list and used an address that Hunter himself

---

**7.** The Court notes that although the omission of facts regarding Defendant Hunter's grant of "use immunity" by a United States Attorney was not fatal to the validity of the wiretap orders, the government's behavior raises some serious questions which are more appropriately addressed through consideration of the defendant's motions to dismiss.

claimed as his residence on numerous occasions. An inventory and notice letter was prepared and even edited to insure proper spelling of his name. The government served its inventory classification with Judge Kane and Hunter's name was also on that list. Agent Langley intended to personally serve Hunter and then changed his mind and sent the notice by mail. The letter was not returned so presumably, it was received by someone at the address previously provided by the defendant. Although the defendant claims to have not received the inventory letter, he was incarcerated at the time notice was served, and the government claims to have been unaware of his incarceration until October 1998.

Most importantly, Hunter has failed to demonstrate that prejudice resulted from the service. The Tenth Circuit case law clearly holds that in cases where the defendant has received notice late but has ample time to prepare his case for trial and challenge the wiretaps themselves, no prejudice has been suffered. *Savaiano,* 843 F.2d 1280, 1291, *United States v. Smith,* 463 F.2d 710, 711, *United States v. Cardall,* 773 F.2d 1128; *see also, United States v. Lawson,* 545 F.2d 557, 565 (7th Cir.1975) (suppression not required where defendant received notice two years after wiretap terminated but three months prior to a hearing on the motion to suppress). The defendant tries to demonstrate prejudice by arguing that he was indicted 18 months later than the other defendants in this case. This argument is incorrect. Case law has held that where the government makes an initial decision that certain individuals would not be indicted, intentionally elects not to serve those persons, and later indicts, those conversations are still not subject to suppression absent a showing of "bad faith." *United States v. Barletta,* 565 F.2d 985, 990 (8th Cir.1977).

There has been no bad faith here. The defendant has not been harmed by the delay in indictment. Defendant Hunter has had ample time in which to review the wiretap documents and challenge the validity of the wiretaps themselves. Indeed, the government claims that it intentionally asked the Court to delay consideration of the wiretap suppression motions in anticipation of various defendants' need for more time. Absent a showing of bad faith and prejudice, a constitutional error does not exist and suppression should not be granted.

For all of the above stated reasons the Court finds that information obtained from the Moore and Crumpton Wiretaps should not be suppressed as to any of the defendants. Accordingly it is,

ORDERED that Defendant Michael Crumpton's Motion to Suppress Evidence Obtained by Intercepted Wire Communications, Motion to Suppress Evidence Obtained Through the Use of a Pen Register, Wiretap, Oral Intercept Device and Video Surveillance Camera, and Supplement to Motion to Suppress Evidence Obtained Through the Use of a Pen Register, Wiretap, Oral Intercept Device and Video Surveillance Camera are DENIED. It is

FURTHER ORDERED that Defendant Devon Camack's Motion to Suppress is DENIED since he was previously allowed to adopt the motion filed by Defendant Crumpton and is therefore bound by the Court's ruling as to Defendant Crumpton. It is

FURTHER ORDERED that Defendant Darian Hunter's Supplement to the Motion to Suppress Evidence Obtained Through the Use of a Pen Register, Wiretap, Oral Intercept Device and Video Surveillance Camera is DENIED. It is

FURTHER ORDERED that Lateshia Harden's Supplemental Motion to Suppress Evidence Based on the Government's Wiretap is DENIED.